UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| JAMES CLEM, Derivatively on Behalf of EXELON CORPORATION, | ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CHRISTOPHER M. CRANE, JOSEPH DOMINGUEZ, ANNE R. PRAMAGGIORE, and WILLIAM A. VON HOENE, JR., | ) ) ) ) | |
| Defendants, | ) ) | |
| - and - | ) ) | |
| EXELON CORPORATION, a Pennsylvania Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT,
<u>AND VIOLATION OF SECURITIES LAW</u>**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for

Breach of Fiduciary Duty, Unjust Enrichment, and Violation of Securities Law. Plaintiff alleges

the following on information and belief, except as to the allegations specifically pertaining to

plaintiff which are based on personal knowledge. This complaint is also based on the investigation

of plaintiff's counsel, which included, among other things, a review of public filings with the U.S.

Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and

other publicly available sources.

**<u>NATURE AND SUMMARY OF THE ACTION</u>**

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal

defendant Exelon Corporation ("Exelon" or the "Company") against certain of its officers and

directors for breach of fiduciary duty, unjust enrichment, and violation of securities law. These wrongs resulted in hundreds of millions of dollars in damages to Exelon's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Exelon to billions of dollars in liability for violations of state and federal law.

2.      Exelon is one of the largest electric companies in the United States. Exelon's controlled subsidiary, Commonwealth Edison Company ("ComEd"), is the Company's largest and most important utility company. In 2018, ComEd accounted for more than 30% of Exelon's total reported net income.

3.      Unknown to the public, however, was that this net income was bolstered by an illegal scheme enacted by some of the top executives at ComEd and Exelon. In particular, from 2011 to 2019, ComEd, which operates in Illinois, bribed a top legislator in Illinois in order to pass favorable legislation, which allowed ComEd to boost prices to its Illinois customers. During this time period, ComEd funneled over $1.3 million to this legislator and his allies. In exchange, the legislator pushed through laws that would have netted ComEd hundreds of millions of dollars.

4.      The Company's bribery scheme came crumbling down in the second half of 2019. The Federal Bureau of Investigation ("FBI") initiated raids on a number of the legislator's top aides and confidants, including a ComEd/Exelon consultant. The Company received a subpoena around the same time.

5.      Then in October 2019, with the approval of the Board of Directors (the "Board") of Exelon, ComEd entered into a Deferred Prosecution Agreement (the "DPA") with the U.S. Department of Justice ("DOJ"). The DPA required Exelon to pay a $200 million criminal penalty, enact new controls, and ComEd publicly admitted to engaging in the bribery. Further,

ComEd/Exelon has become *persona non grata* in Illinois, as favorable legislation that was expected to pass in 2019 has stalled.

6.     In addition, the Individual Defendants (as defined herein) made a series of false statements to the investing public, which inflated the Company's stock price.  After the truth was revealed, investors filed a securities fraud class action in the U.S. District Court for the Northern District of Illinois.  On April 21, 2021 U.S. District Judge Virginia M. Kendall denied the defendants' motions to dismiss in that action, finding that the plaintiff adequately alleged that the defendants made a series of false and misleading statements with scienter.

7.     On August 11, 2020, over 10 months ago, plaintiff made a litigation demand on the Board (the "Demand").  After months of delay, on April 5, 2021, plaintiff finally received a letter from counsel stating that it represented a Special Litigation Committee ("SLC") of the Board newly formed to consider the Demand.

8.     In response, plaintiff asked what steps the SLC was taking to preserve the Company's valuable claims in light of the substantial passage of time and pending statute of limitation deadlines.  The SLC stated that it planned to do nothing about the statute.  Thus, in light of the substantial amount of time that has passed, and the SLC's apparent willingness to let valuable claims simply expire, plaintiff now brings this action.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court also has jurisdiction pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for

violations of section 14(a) of the Exchange Act and SEC Rule 14a-9, promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Exelon maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Exelon, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff James Clem was a stockholder of Exelon at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Exelon stockholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

14.     Nominal defendant Exelon is a Pennsylvania corporation with principal executive offices located at 10 South Dearborn Street, Chicago, Illinois.  Accordingly, Exelon is a citizen of

Pennsylvania and Illinois. Exelon is a utility services holding company engaged in the generation, delivery, and marketing of energy through its subsidiaries which includes ComEd. ComEd purchases and regulates the retail sale of electricity and provides transmission and distribution services of electricity to retail customers throughout northern Illinois. As of December 31, 2020, Exelon had 32,340 employees.

**Defendants**

15.     Defendant Christopher M. Crane ("Crane") is Exelon's Chief Executive Officer ("CEO") and a director and has been since March 2012 and President and has been since September 2008. Defendant Crane was Exelon's Chief Operating Officer from September 2008 to March 2012; Senior Vice President from at least December 2004 to 2007; and Executive Vice President from 2007 to September 2008. Defendant Crane is a member of Exelon's Risk Committee and has been since at least April 2020. Defendant Crane is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. Exelon paid defendant Crane the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2019 | $1,335,633 | - | $11,000,064 | - | $2,103,957 | $468,171 | $475,912 | $15,383,737 |
| 2018 | $1,261,000 | - | $10,099,725 | - | $2,123,070 | $1,734,587 | $380,051 | $15,598,433 |
| 2017 | $1,261,000 | - | $10,099,755 | - | $1,585,531 | $1,524,765 | $386,808 | $14,857,859 |
| 2016 | $1,255,515 | - | $10,099,718 | - | $1,639,300 | $1,836,211 | $400,958 | $15,231,702 |
| 2015 | $1,224,808 | - | $9,821,055 | - | $2,072,777 | $2,462,551 | $380,054 | $15,961,245 |
| 2014 | $1,200,000 | $155,355 | $9,345,480 | - | $1,553,550 | $2,431,986 | $304,459 | $14,990,830 |
| 2013 | $1,191,539 | - | $12,606,074 | - | $1,565,250 | $1,584,841 | $243,994 | $17,191,698 |
| 2012 | $1,078,750 | $131,100 | $4,234,680 | $1,191,300 | $1,311,000 | $2,063,852 | $190,568 | $10,201,250 |
| 2011 | $858,692 | - | $1,475,600 | $584,680 | $1,136,857 | $1,430,802 | $75,513 | $5,562,144 |

Defendant Crane is a citizen of Illinois.

16.     Defendant Joseph Dominguez ("Dominguez") is ComEd's CEO and has been since August 2018.  Defendant Dominguez was Exelon's Executive Vice President of Governmental & Regulatory Affairs & Public Policy from March 2015 to August 2018; Senior Vice President of Governmental & Regulatory Affairs & Public Policy from 2012 to March 2015; Senior Vice President, Federal Regulatory Affairs & Public Policy from 2010 to 2012; and Senior Vice President, Communications and Public Affairs from 2009 to 2010.  Defendant Dominguez is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.  Defendant Dominguez is a citizen of Illinois.

17.     Defendant Anne R. Pramaggiore ("Pramaggiore") was Exelon's Senior Executive Vice President and Exelon Utilities' CEO from June 2018 to October 2019.  Defendant Pramaggiore was ComEd's CEO from 2012 to June 2018; President from 2009 to June 2018; and Chief Operating Officer from 2009 to 2012.  Defendant Pramaggiore was ComEd's Executive Vice President, Customer Operations, Regulatory and External Affairs from 2007 to 2009; Senior Vice President, Legislative and External Affairs from 2005 to 2007; and Vice President, Regulatory and Strategic Services from 2002 to 2005.  Defendant Pramaggiore is named as a defendant in a related securities class action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.  Exelon paid defendant Pramaggiore the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------------------------------------------------------|------------------------|-------|
| 2019 | $758,915 | $2,388,777 | $668,209 | $223,801 | $263,087 | $4,302,789 |
| 2018 | $720,225 | $3,892,882 | $885,414 | $194,694 | $220,915 | $5,914,130 |

Defendant Pramaggiore is a citizen of Illinois.

18. Defendant William A. Von Hoene, Jr. ("Von Hoene") was Exelon's Senior Executive Vice President and Chief Strategy Officer from March 2012 to March 2021. Defendant Von Hoene was Exelon's Executive Vice President, Finance and Legal from 2009 to March 2012; Executive Vice President and General Counsel from 2008 to 2009; and Senior Vice President and General Counsel from 2006 to 2008. Defendant Von Hoene was also Exelon's Senior Vice President and acting General Counsel from 2005 to 2006; Senior Vice President and Deputy General Counsel from 2004 to 2005 and Vice President and Deputy General Counsel from 2002 to 2004. Defendant Von Hoene is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. Exelon paid defendant Von Hoene the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2019 | $962,271 | - | $2,920,831 | - | $1,045,311 | $270,738 | $466,524 | $5,665,675 |
| 2018 | $904,673 | - | $2,920,823 | - | $1,092,880 | $242,061 | $524,221 | $5,684,658 |
| 2017 | $882,696 | - | $2,920,829 | - | $857,520 | $202,125 | $374,057 | $5,237,227 |
| 2016 | $831,350 | - | $3,700,342 | - | $1,237,642 | $216,271 | $198,770 | $6,184,375 |
| 2015 | $755,296 | - | $2,296,821 | - | $835,753 | $163,284 | $111,890 | $4,163,044 |
| 2014 | $736,710 | $65,146 | $2,067,060 | - | $651,463 | $161,623 | $97,304 | $3,779,306 |
| 2013 | $717,446 | - | $3,371,564 | - | $639,495 | $179,014 | $74,359 | $4,981,878 |
| 2012 | $685,577 | $56,525 | $1,314,390 | $367,840 | $565,250 | $135,681 | $67,338 | $3,192,601 |
| 2011 | $621,058 | - | $1,085,000 | $416,740 | $616,071 | $110,241 | $77,761 | $2,926,871 |

Defendant Von Hoene is a citizen of Illinois.

19. Collectively, the defendants identified in ¶¶15-18 are referred to herein as the "Individual Defendants."

## EXELON'S CODE OF BUSINESS CONDUCT

20.     Exelon has had a Code of Business Conduct (the "Code") since at least 2012 that prohibited lobbying activities on behalf of Exelon without express approval of the Company's Government and Regulatory Affairs or the Legal Department.  In particular, the Code stated:

**Lobbying**

Exelon is subject to regulation at various levels of government, and is profoundly affected by decisions of elected and appointed government officials. Exelon is therefore engaged with and actively lobbies such government officials in the policymaking process in support of Exelon's business interests on various issues. It is important to our success that advocacy on behalf of Exelon be consistent, coordinated and focused on both our short-term and long-term interests. No Exelon personnel may engage in lobbying activities on behalf of the Company, testify or provide comments before any legislative committees for Exelon, or accept an appointment to an advisory or study group established by a legislative body or administrative agency on behalf of Exelon without first obtaining the approval of Government and Regulatory Affairs or the Legal Department. Government and Regulatory Affairs will also help ensure compliance with all lobbying registration, reporting, and disclosure requirements. All Exelon lobbyists are expected to follow both the letter and spirit of the lobbying laws and to maintain the highest standards of professional integrity.

21.     The Code notes that "Exelon … advocates for legislation we believe will enhance value for our customers, communities, employees and shareholders. ***Those of us who have contact with legislators***, regulators, executive branch officials or their staffs ***may be involved in lobbying, and must take care to comply with the laws applicable to these activities***."

22.     The Code also required employees and agents to: (i) "[k]eep accurate and complete records so all payments are honestly detailed and company funds are not used for unlawful purposes"; (ii) "[c]onduct due diligence on all potential agents, consultants or other business partners"; (iii) "[n]ever use a third party to make payments or offers that could be improper"; and (iv) "never request, offer or accept any form of payment or incentive intended to improperly influence a decision."

23.     Exelon's Code also prohibited bribery and listed as an example of a prohibited bribe: "Providing something of value for the benefit of a public official in a position to make a decision that could benefit the company."

24.     The Code applied to "directors, officers and employees," Exelon "subsidiaries," and "[t]hird parties such as consultants[.]" Further, "[a]ll non-represented [e.g., nonunion] employees and members of the Board of Directors must complete a certification of compliance questionnaire each year."

25.     Under the heading, "Disciplinary Action," the Code stated that "[t]he Code is of the utmost importance to the company and violations will not be tolerated.   Accordingly, the Code will be appropriately enforced, regardless of the seniority, role or location of those involved in misconduct," and anyone who "[a]uthorizes or participates in actions that violate the Code or law" or who "[f]ails to complete or falsely completes a certification of compliance," may be subject to "[t]ermination of employment" or "[r]eferral to law enforcement." Further, the Code stated, "[a] waiver of any provision of the Code will be made only in exceptional circumstances for substantial cause" and "any waiver of a provision in the Code for any director or executive officer will be disclosed to shareholders."

26.     The Company explicitly noted the Code and attached it as an exhibit to its filings with the SEC, including its combined Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K") filed with the SEC on February 8, 2019.  Further, the Code noted that it was approved by the Board.

### EXELON ENGAGES IN AN EIGHT-YEAR BRIBERY CAMPAIGN

27.     Exelon, a utility services holding company, engages in the generation and marketing of energy in the United States and Canada.  It is one of the largest electric companies in

the United States. One of its subsidiaries is ComEd, which, according to the Company's combined Quarterly Report on Form 10-Q filed with the SEC on May 8, 2020, purchases, transmits, and distributes electricity in northern Illinois, including the City of Chicago. ComEd is the largest utility company in Illinois. It employs over 6,000 individuals, and delivers electricity to approximately 70% of Illinois's population.

28.     Exelon, through ComEd, engaged in an eight-year-long bribery scheme in order to influence Illinois lawmakers to enact legislation favorable to Exelon. The public learned the extent of this bribery scheme on July 17, 2020. On that day, the DOJ issued a press release announcing that ComEd "Agrees to Pay $200 Million to Resolve Federal Criminal Investigation Into Bribery Scheme." The press release also noted that "ComEd Admits Arranging Jobs and Contracts for Political Allies of High-Level State of Illinois Official." ComEd admitted to the wrongdoing and agreed to pay $200 million as part of the DPA that would stay in place for three years. That same day, Exelon and ComEd filed a combined Current Report on Form 8-K disclosing the DPA.

29.     ComEd engaged in the scheme in order to get the Illinois General Assembly to pass bills favorable to it. The Illinois General Assembly routinely considered bills and passed legislation that had a substantial impact on ComEd's operations and profitability, including legislation that affected the regulatory process used to determine the rates ComEd could charge customers for the delivery of electricity. In order for legislation to become law, it must be passed by both houses of the Illinois General Assembly—the Illinois House of Representatives and the Illinois Senate.

30.     Two laws are of particular importance in this matter. The first is the Energy Infrastructure and Modernization Act ("EIMA"), which the General Assembly passed in 2011. EIMA provided for a regulatory process through which ComEd was able to more reliably

determine rates it could charge customers and, in turn, determine how much money it was able to generate from its operations to cover, among other things, costs for grid-infrastructure improvements. The passage of EIMA therefore helped improve ComEd's financial stability. EIMA was passed by the Illinois House of Representatives in or around May 2011, and by the Illinois Senate in or around August 2011. EIMA was then vetoed by the Governor of the State of Illinois. In October 2011, both houses of the Illinois General Assembly voted to override the Governor's veto. The second law is the Future Energy Jobs Act ("FEJA"), which the Illinois General Assembly passed in 2016. FEJA provided for a renewal of the regulatory process that was beneficial to ComEd.

31. During the relevant period, the Speaker of the Illinois House of Representatives, Rep. Michael J. Madigan ("Madigan"), exercised considerable power over the Illinois House of Representatives.[1] He was able to exercise control over what measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd.

32. In the statement of facts, attached to DPA, the DOJ identified two individuals at ComEd that played a significant role in the bribery scheme detailed herein. The DOJ called the first "CEO-1" and identified CEO-1 as the "chief executive officer of ComEd between in and around March 2012 and May 2019. From June 1, 2019 to October 15, 2019, CEO-1 served as a senior executive at Exelon Utilities and had oversight authority over ComEd's operations." This description matches defendant Pramaggiore and only defendant Pramaggiore. The second is "Senior Executive 1" that "served as ComEd's senior vice president for legislative and external

---

[1] The DOJ refers to "Public Official A" in the DPA, and Madigan is the only person that fits the DOJ's description of "Public Official A."

affairs from in or around March 2012 until in or around September 2019." This individual's description matches that of Fidel Marquez ("Marquez"). In addition, the DOJ referred to an "Individual A." In particular, the statement of facts stated, "Individual A served in the Illinois House of Representatives for approximately ten years beginning in 1972. After Individual A's service in the Illinois House of Representatives, Individual A served as a lobbyist and/or consultant for ComEd until 2019." Individual A's description matches that of Michael McClain ("McClain"). Next, the DOJ identified "Lobbyist 1" in the statement of facts that "Lobbyist 1 served as ComEd's executive vice president of legislative and external affairs from in and around 2009 until Lobbyist 1's retirement in and around 2012. From 2012 to 2019, Lobbyist 1 served as an external lobbyist for ComEd." The description of Lobbyist 1 matches John Hooker ("Hooker"). Lastly, the statement of facts identifies "Consultant 1" who was "the owner of Company 1, which performed consulting services for ComEd until in and around 2019." This description matches Jay Doherty ("Doherty"), the owner of Jay D. Doherty & Associates ("JDDA"), which performed consulting services for ComEd until 2019.

33.     On November 18, 2020, the DOJ indicted defendant Pramaggiore, Hooker, Doherty, and McClain for their actions in connection with the illegal bribery conspiracy. While the indictment identified Marquez by name, it did not name him as a defendant.

34.     As part of the DPA, ComEd admitted that the following facts concerning its illegal bribery scheme were true. From 2011 to 2019, in an effort to influence and reward Madigan's efforts to assist ComEd with respect to legislation concerning ComEd and its business, ComEd arranged for various associates of Madigan, including Madigan's political allies and individuals who performed political work for Madigan, to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even in instances where

certain political allies and workers performed little or no work that they were purportedly hired to perform for ComEd.

35.    Beginning no later than 2011, Madigan and McClain sought to obtain from ComEd jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts for various associates of Madigan, such as precinct captains who operated within Madigan's legislative district.  In or around 2011, McClain and Hooker developed a plan to direct money to two of Madigan's associates ("Associate 1" and "Associate 2") by having ComEd pay them indirectly as subcontractors to Doherty.  Payments to Associate 1 and Associate 2, as well as later payments to other subcontracted associates of Madigan, continued until in or around 2019, even though those associates did little or no work during that period.

36.    Doherty agreed in 2011 that Madigan's associates would be identified as subcontractors under Doherty's contract and that ComEd's payments to Doherty would be increased to cover payments to those subcontractors.  Between in or around 2011 and 2019, Doherty executed written contracts and submitted invoices to ComEd that made it falsely appear that the payments made to JDDA were all in return for Doherty's advice on "legislative issues" and "legislative risk management activities," and other similar matters, when in fact a portion of the compensation paid to JDDA was intended for ultimate payment to Madigan's associates, who in fact did little or no work for ComEd.  Doherty and JDDA did little, if anything, to direct or supervise the activities of Madigan's associates, even though they were subcontracted under and received payments through JDDA.  Moreover, because they were paid indirectly through JDDA, the payments to Madigan's associates over the course of approximately eight years were not reflected in the vendor payment system used by ComEd, and as a result, despite that Madigan's associates were subcontracted under and receiving payments through JDDA, no such payments

were identifiable in ComEd's vendor payment system. Certain senior executives and agents of ComEd were aware of these payments from their inception until they were discontinued in or around 2019. For example, in or around May 2018, Madigan, through McClain, asked defendant Pramaggiore to hire a political ally of Madigan who was retiring from the Chicago City Council at the end of the month ("Associate 3"). Defendant Pramaggiore, in coordination with Marquez and Doherty, agreed that ComEd would pay Associate 3 approximately $5,000 a month indirectly as a subcontractor through JDDA.

37.     At the time defendant Pramaggiore approved this arrangement, she was aware that there were other associates of Madigan that were paid indirectly as subcontractors through JDDA, which defendant Pramaggiore referred to as the "roster." Defendant Pramaggiore also agreed that Madigan—rather than an officer or employee of ComEd or JDDA—would advise Associate 3 of this new arrangement. In or around June 2018, JDDA's contract was revised to include extra funding for the purpose of paying Associate 3. In seeking to justify the extra funding, Doherty claimed falsely that an additional fee of $5,000 a month was necessary under JDDA's contract, in part because of JDDA's "expanded role with Cook County Board president's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month in compensation was intended for payment to Associate 3. ComEd approved of the additional payments to JDDA, knowing they were intended for Associate 3. Certain senior executives and agents of ComEd were also aware of the purpose of these payments to Madigan's associates, namely, that they were intended to influence and reward Madigan in connection with Madigan's official duties and to advance ComEd's business interests. For example:

(a)     On or about May 16, 2018, McClain explained to Marquez why certain individuals were being paid indirectly through JDDA, by making reference to their utility to

Madigan's political operation. McClain identified Associate 1, one of the several individuals on JDDA's payroll, as "one of the top three precinct captains" who also "trains people how to go door to door ... so just to give you an idea how important the guy is."

(b)     On or about February 7, 2019, McClain advised Marquez about how to present information within ComEd concerning the renewal of JDDA's contract for 2019. In the conversation, McClain advised Marquez that, "I would say to you don't put anything in writing," explaining later in the conversation because "all it can do is hurt ya." McClain further advised Marquez that, if asked by a ComEd official why JDDA was being paid, Marquez should explain that the associates of Madigan were former ward committeemen and aldermen, that it was a "favor," and that it would be up to Doherty to prove that Madigan's associates performed work, not ComEd.

(c)     On or about February 11, 2019, McClain had a conversation with Hooker, who by that time had retired from ComEd, but had continued to serve as a paid external lobbyist to ComEd. In discussing how the renewal of JDDA's contract—which included significant payments to JDDA to account for indirect payments to Madigan's associates—should be communicated internally, McClain stated, "We had to hire these guys because [Madigan] came to us. It's just that simple." Hooker agreed, and added, "It's, it's clean for all of us."

(d)     On or about February 13, 2019, Doherty advised Marquez that Associate 1 and Associate 2 had been made "subcontractors" of JDDA at the request of Hooker, and that Associate 3 was also currently being paid as a "subcontractor." Doherty emphasized that he had told no one of the arrangement per instructions previously given to him, and cautioned Marquez that ComEd should not tamper with the arrangement because "your money comes from Springfield," and that Doherty had "every reason to believe" that McClain had spoken to Madigan

about the retention of Madigan's associates, and knew Hooker had done so. Doherty added that Madigan's associates "keep their mouth shut, and, you know, so. But, do they do anything for me on a day to day basis? No." Doherty explained that these payments were made "to keep [Madigan] happy, I think it's worth it, because you'd hear otherwise."

      (e)    On or about March 5, 2019, McClain and ComEd personnel participated in a meeting during which they discussed JDDA's contract and why the indirect payments to Madigan's associates made under the guise of that contract should be continued for another year. During that meeting, McClain explained that for decades, Madigan had named individuals to be ComEd employees, such as meter readers, as part of an "old-fashioned patronage system." In response, a ComEd employee acknowledged that such hires could be a "chip" used by ComEd. ComEd renewed JDDA's contract.

      (f)    On or about March 6, 2019, McClain and Hooker discussed the renewal of JDDA's contract. During the conversation, Hooker explained that "with the [Doherty] stuff, you got a little leg up," to which McClain agreed. Hooker later added, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." McClain responded, "Right. Exactly. Exactly."

    38.    Between 2011 and 2019, indirect payments made to Madigan's associates—who performed little or no work for ComEd—totaled approximately $1,324,500. These indirect payments were made not only through JDDA, but through other additional third-party vendors. As with JDDA, these other third-party vendors entered into contracts with ComEd that noted that the payments made to these vendors by ComEd were for consulting and related services, when in truth, a substantial portion of the money paid to these vendors was intended for Madigan's associates, who did little or no work for ComEd. These payments, like those made indirectly

through JDDA, were intended to influence and reward Madigan in connection with the advancement and passage of legislation favorable to ComEd in the Illinois General Assembly. Prior to ComEd's discovery of the federal law enforcement investigation, Madigan and McClain's approval was sought by ComEd before payments to certain of Madigan's associates were discontinued, even though these individuals performed little or no work for ComEd. As with the payments made to Madigan's associates through JDDA, despite that Madigan's associates were subcontracted under and receiving payments through these third party vendors, no such payments were identifiable in ComEd's vendor payment system. Certain former ComEd executives designed these payment arrangements in part to conceal the size of payments made to Madigan's associates, and to assist ComEd in denying responsibility for oversight of Madigan's associates, who performed little or no work for ComEd.

39.     Beginning in 2017, Madigan sought the appointment of an associate to the ComEd Board of Directors (hereinafter referred to as "Board Member 1"). Madigan's request was communicated by McClain to defendant Pramaggiore. In May 2018, in response to internal company opposition to the appointment of Board Member 1, defendant Pramaggiore asked McClain if Madigan would be satisfied if she arranged for Board Member 1 to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year. McClain told defendant Pramaggiore that Madigan would appreciate if she would "keep pressing" for the appointment of Board Member 1, and defendant Pramaggiore agreed to do so.

40.     In September 2018, defendant Pramaggiore (who by this time had been promoted to an executive position within Exelon Utilities, in which capacity she maintained oversight authority over ComEd) assured McClain that she was continuing to advocate for the appointment of Board Member 1 made at Madigan's request because "[y]ou take good care of me and so does

- 17 -

our friend [Madigan] and I will do the best that I can to, to take care of you." On or about April 25, 2019, defendant Pramaggiore advised McClain by text message: "Just sent out Board approval to appoint [Board Member 1] to ComEd Board." The following day, April 26, 2019, ComEd filed a notice with the SEC stating that Board Member 1 had served as a director of ComEd since April 2019. Although ComEd and Exelon conducted due diligence on Board Member 1 and ultimately determined he was qualified for a board position, no one at ComEd or Exelon recruited Board Member 1 to serve as a director, and ComEd did not interview or vet other outside candidates for the vacant board seat. ComEd appointed Board Member 1, in part, with the intent to influence and reward Madigan in connection with Madigan's official duties.

41.     In 2011, ComEd agreed to retain "Law Firm A," and entered into a contract pursuant to which ComEd agreed to provide Law Firm A with a minimum of 850 hours of attorney work per year. This contract was entered into with Law Firm A, in part, with the intent to influence and reward Madigan in connection with his official duties and because personnel and agents of ComEd understood that giving this contract to Law Firm A was important to Madigan. In 2016, Law Firm A's contract was up for renewal. As part of renewal discussions, personnel within ComEd sought to reduce the hours of legal work they provided to Law Firm A from the 850 hours specified in the 2011 retention agreement because ComEd paid only for hours worked and there was not enough appropriate legal work to give to Law Firm A to fill 850 annual hours. Thereafter, an attorney associated with Law Firm A ("Lawyer A") complained to McClain about ComEd's effort to reduce the amount of work provided to Law Firm A. On or about January 20, 2016, McClain contacted defendant Pramaggiore and wrote: "I am sure you know how valuable [Lawyer A] is to our Friend [Madigan]," and then went on to write: "I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will

go to our Friend [Madigan]. Our Friend [Madigan] will call me and then I will call you. Is this a drill we must go through?" Defendant Pramaggiore replied in writing: "Sorry. No one informed me. I am on this." Thereafter, defendant Pramaggiore tasked a ComEd employee, who was assigned as a "project manager" to assist with the project of obtaining legislative approval of FEJA, to ensure that Law Firm A's contract was renewed. The project manager had no oversight authority over ComEd's legal department and was not otherwise involved in deciding what legal professionals the legal department retained. The project manager was assigned the task of ensuring Law Firm A's contract was renewed because the work provided to Law Firm A was, in part, designed to influence and reward Madigan in connection with his official duties, including the promotion and passage of FEJA. ComEd agreed in June 2016 to renew Law Firm A's contract with substantially reduced annual hours.

42.     Beginning no later than 2013, and continuing until in or around 2019, ComEd operated an internship program. As part of the program, ComEd would accept a specified target number of students who primarily resided in a Chicago ward that Madigan was associated with ("Madigan's Ward") and that were recommended to ComEd by associates of Madigan, including McClain. ComEd hired students from Madigan's Ward, in part, with the intent to influence and reward Madigan in connection with his official duties.

43.     In short, between 2011 and 2019, during the same time frame that ComEd was making payments to Madigan's associates, and extending other benefits for the purpose of influencing and rewarding Madigan, ComEd was also seeking Madigan's support for legislation that was beneficial to ComEd, including EIMA and FEJA, that would ensure a continued favorable rate structure for ComEd. The reasonably foreseeable anticipated benefits to ComEd of such legislation exceeded $150 million.

44.     As stated above, ComEd stipulated that the above information from the DPA contained in paragraphs 31 through 43 "is true and accurate."  Further, ComEd entered the DPA "pursuant to authority granted by the Board of Directors of Exelon."  Accordingly, the Board is well aware of the wrongdoing described above.

## FALSE AND MISLEADING STATEMENTS

45.     The criminal bribery conspiracy was not the only wrongdoing occurring at Exelon. During the relevant period, the Individual Defendants made false and misleading statements, engaged in a scheme to deceive the market, and undertook a course of conduct that artificially inflated the price of Exelon common stock.  In particular, the Individual Defendants' and the Company's claimed successes with the Illinois General Assembly were the result of an undisclosed bribery scheme that exposed the Company to substantial risk of criminal penalties and diminished legislative and public reputation.

46.     On February 8, 2019, Exelon filed the combined 2018 Form 10-K with the SEC. Defendants Crane, Pramaggiore, and Dominguez signed the 2018 Form 10-K.  The 2018 Form 10-K directed investors to the Code, located on the Company's website, the contents of which, in part, are stated above.  However, the statements in the Code were false and misleading as, contrary to its language, Exelon, through ComEd, was engaged in a massive bribery scheme and had been for eight years.

47.     In addition, the 2018 Form 10-K also contained false and misleading statements concerning the Company's lobbying efforts, stating, in part:

> Generation's Dresden, Byron, and Braidwood nuclear plants in Illinois are also showing increased signs of economic distress, which could lead to an early retirement, in a market that does not currently compensate them for their unique contribution....  ***Exelon continues to work with stakeholders on state policy solutions***, while also advocating for broader market reforms at the regional and federal level [(the "State Policy Solutions Statement")].

- 20 -

48. Concerning the financial benefits of FEJA, the 2018 Form 10-K stated, "FEJA allows ComEd to defer energy efficiency costs ... as a separate regulatory asset that is recovered through the energy efficiency formula rate over the weighted average useful life, as approved by the [Illinois Commerce Commission], of the related energy efficiency measures." The 2018 Form 10-K also claimed:

> *Pursuant to FEJA, ... Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation* executed the required ZEC procurement contracts with Illinois utilities, including ComEd, effective January 26, 2018 and *began recognizing revenue, with compensation for the sale of ZECs retroactive to the June 1, 2017 effective date of FEJA.* During the year ended December 31, 2018, *Generation recognized* revenue of $373 million, of which *$150 million related to ZECs generated from June 1, 2017 through December 31, 2017.*
>
> *         *         *
>
> On December 7, 2016, *Illinois FEJA* was signed into law by the Governor of Illinois and *included a ZES that now provides compensation to Clinton and Quad Cities for the carbon-free attributes of their production through 2027. With the passage of the Illinois ZES in December 2016, Generation reversed its June 2016 decision to permanently cease generation operations at the Clinton and Quad Cities nuclear generating plants.* Clinton and Quad Cities are currently licensed to operate through 2026 and 2032, respectively.

49. The 2018 Form 10-K identified supposed "risks" facing the Company, while failing to disclose that the bribery scheme was already occurring. In particular, the 2018 Form 10-K stated:

> *The Registrants [including Exelon and ComEd] have large consumer customer bases and as a result could be the subject of public criticism focused on the operability of their assets and infrastructure and quality of their service. Adverse publicity of this nature could render legislatures and other governing bodies,* public service commissions and other regulatory authorities, *and government officials less likely to view energy companies such as Exelon and its subsidiaries in a favorable light, and could cause Exelon and its subsidiaries to be susceptible to less favorable legislative* and regulatory *outcomes, as well as increased regulatory oversight and more stringent legislative or regulatory requirements* (e.g. disallowances of costs, lower ROEs). The imposition of any of the foregoing could have a material negative impact on the Registrants' business or consolidated financial statements.

50.    The failure of the 2018 Form 10-K to discuss the Company's bribery scheme also violated Item 303 of SEC regulation S-K, 17 C.F.R. §229.303, which required the Company to "[d]escribe any known trends or uncertainties that have had or that [the Company] reasonably [expects will] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii).  Further, the 2018 Form 10-K violated Item 303 requirement that the defendants disclose any events that would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(b)(2)(i)-(ii).

51.    In addition, the 2018 Form 10-K violated Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, which required the report to contain "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," by not discussing the bribery scheme.  The Company's combined Quarterly Reports on Forms 10-Q also violated Items 303 and 105 but similarly failing to comply with the requirements that the defendants discuss the bribery scheme in those filings.

52.    Also, on February 8, 2019, the Company held an earnings conference call with analysts and investors regarding its fourth quarter and year-end 2018 financial results.  During the call, an analyst asked whether there was "any update on sort of efforts to engage the legislature in Illinois, coalition building, et cetera?" Defendant Crane responded:

> ***As you can imagine, we work within the coalitions within the state on what's needed to continue to advance the environmental stakeholders, the customers in sound investment. So we have our folks communicating in those coalitions and communicating with the legislative folks***.  Premature to say what it looks like at the end of the day. But they're at the beginning of the sausage-making right now. And we'll continue to have productive conversations.

53.     Exelon also published on its website its "Political Contributions Reports."  The Political Contributions Reports claimed that the contributions were all made in accordance with its Corporate Political Contributions Guidelines and that "this report includes a listing of Exelon's political contributions for the above noted reporting period."  These statements were false, however, as the Company was making bribes to Madigan that were not contained in the reports.

54.     On May 2, 2019, the Company held an earnings conference call with analysts and investors to discuss its financial results for the first quarter of 2019.  Discussing the Company's attempts to have favorable legislation passed, defendant Crane stated:

> In Illinois, legislation was introduced that would require the Illinois Power Authority to procure clean capacity for ComEd customers using the fixed resource requirement mechanism that is currently in the PJM tariff.  In addition to supporting of course truly clean energy future, in Illinois the legislation would also ensure that consumers pay less than they do today.
>
> The concept of the FRR has a wide support and has been endorsed by the Illinois hub – the Clean Jobs Coalition and organized labor. Another piece of legislation has been introduced into Illinois to extend the formula rate – ComEd's formula rate provides tangible benefits to the consumers as well as certainty we need to make investments and improve reliability and resiliency in customer service while keeping the bills affordable....
>
> It's a busy legislative season as Governor Pritzker and the General Assembly tackle Illinois' significant budget problems. However, *we are optimistic these 2 priorities can get done this year*

55.     In response to an analyst asking for more detail on the bills related to energy policy in Illinois, defendant Crane stated:

> Our bill for the FRR, there's one that's a path to 100, and then there is one that's the clean jobs coalition. So we're in the process right now of negotiating with the all the bills so we can come together and provide the legislature with a coalition that agrees on many things right now.  Just working through the details.  We hope to be done. Meetings are constant. I've met with the leadership of both the House and Senate, talking about what we need to do and them showing their support for us going forward. So we're just going to keep working on it as we always do. If it's not done in the regular session because of the other priorities, we will have it positioned to move through during the veto session. That's the Generation bill.

The other bill in Illinois that will affect Exelon is the extension of the ComEd formula rate for 10 years. That bill is proceeding. We've been able to work with stakeholders to gain support and recognition.

*      *      *

***We're working with the coalitions as hard as we can to have something presentable to the – that the legislature supports to move in the Spring***. But what I've cautioned in our roadshows and on the calls previously, there is a very aggressive legislative agenda in Illinois this Spring.      ***We need to be ready to be able to tell our story, communicate and have that coalition that we're building, endorsing where we're heading***. But we need to be realistic. We do think if it doesn't happen in the Spring, we'll be ready to move it in the veto session in the fall.

56.      That same day, the Company filed its combined Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC. The Q1 2019 Form 10-Q was signed by defendants Crane and Dominguez. The Q1 2019 Form 10-Q contained misleading statements concerning the Company's lobbying efforts to secure passage of the Illinois Clean Energy Progress Act, as they did not disclose the bribery scheme with Madigan. In particular, the Q1 2019 Form 10-Q stated:

On March 14, 2019, the Clean Energy Progress Act was introduced in the Illinois General Assembly to preserve Illinois' clean energy choices arising from FEJA and empower the IPA to conduct capacity procurements outside of PJM's base residual auction process ***Exelon and Generation are working with legislators and stakeholders*** and cannot predict the outcome or the potential financial impact, if any, on Exelon or Generation [(the "CEPA Lobbying Statement")].

57.      Discussing FEJA, the Q1 2019 Form 10-Q stated, in pertinent part:

Pursuant to FEJA, … Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation executed the ZEC procurement contracts with Illinois utilities, including ComEd, effective January 26, 2018 and began recognizing revenue with compensation for the sale of ZECs retroactive to the June 1, 2017 effective date of FEJA. During the three months ended March 31, 2018, Generation recognized $150 million of revenue related to ZECs generated from June 1, 2017 through December 31, 2017.

*      *      *

"***Under FEJA***, energy efficiency revenue varies from year to year based upon fluctuations in the underlying costs, investments being recovered, and allowed ROE.

- 24 -

*Energy efficiency revenue increased during the three months ended March 31, 2019* as compared to the same period in 2018, primarily due to the impact of higher rate base.

58.     The Q1 2019 Form 10-Q also stated that the board of directors of ComEd appointed Juan Ochoa ("Ochoa") to its board.  On information and belief, Ochoa is "Board Member 1," as described by the DOJ that he received his position because of the illegal bribery scheme.

59.     The Q1 2019 Form 10-Q also repeated the State Policy Solutions Statement and the risk factors detailed above.

60.     On July 15, 2019, Exelon filed a combined Current Report on Form 8-K announcing that Exelon and ComEd "*received a grand jury subpoena* from the U.S. Attorney's Office for the Northern District of Illinois *requiring production of information concerning their lobbying activities in the State of Illinois*.  The Companies have pledged to cooperate fully and are cooperating fully with the U.S. Attorney's Office in expeditiously providing the requested information."

61.     On August 1, 2019, the Company held an earnings conference call with analysts and investors to discuss its financial results for the second quarter of 2019.  During the call, defendant Crane addressed the subpoena the Company received.  In doing so, however, he downplayed the effect of the subpoenas on Exelon and scope of the wrongdoing.  In particular, defendant Crane stated:

> [W]e've received numerous questions from our investors about the subpoena in Illinois from the U.S. Attorney's Office. *We* are cooperating fully and provided all – *are providing all information requested by the U.S. Attorney's Office*.  We simply can't comment further on the investigation, and we are not going to speculate on whether it may affect legislative efforts in the – Illinois this fall.  What we do know about this fall session is there are a number of stakeholders who want to see clean energy legislation enacted.
>
> Illinois lags behind other progressive states on clean energy policy. *Passing the clean energy legislation is a priority for many stakeholders, include -- in Illinois,*

*including the Citizens Utility* Board**, [Labor], the Clean Jobs Coalition and the Renewable Community***. These stakeholders want to greatly expand their renewable penetration so the state will be able to achieve the 100% clean energy target by 2030. [Senior Vice President of Governmental Regulatory Affairs and Public Policy] **Kathleen [Barrón] and her team are working with the stakeholders to help crack the legislation -- the legislative package and the -- inform members of general assembly on the benefits of this legislation*.

\* \* \*

**As you can imagine, we have a significant communications drive with the legislative and the administration on the situation and we are prepared to present them with a coalition**[.]

62.     Defendant Von Hoene, meanwhile, claimed that the subpoenas had "no impact" on the Company's outreach to legislators in order to get certain bills passed.  In particular, defendant Von Hoene stated:

The activity that has started and continued for a number of months on advancing the clean energy legislation among the coalition that was referenced by Kathleen and by [defendant Crane] remains unchanged. We're meeting regularly, **we're doing the stakeholder outreach, we're trying to craft a package and educate members of legislature and the tendency of the grand jury and subpoenas had no impact on the level of activity or the intensity of the activity in that regard.**

63.     Defendant Pramaggiore claimed that Chicago and Exelon's "priorities" were "very much aligned" in response to a question asking for "some background of your franchise agreement in Chicago." In particular, defendant Pramaggiore stated:

[T]he expiration date is the end December of 2020.  The city needs to give us, in its indication by the end of the year, as to whether they want to maintain status quo, renegotiate or terminate the franchise agreement. So we'll know by the end of the year. But we're in discussions with them. **We started to have discussions around that. We understand what their priorities are and they are, I think, priorities are very much aligned with ours.** They want to see more clean energy in the city of Chicago and they are concerned about vulnerable population in particular in terms of pricing, and those are all – **those are both strong strategic elements of our focus going forward at all our utilities**. But that's the status right now.

64.     On August 1, 2019, the Company filed its combined Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.

Defendants Crane and Dominguez signed the Q2 2019 Form 10-Q. The Q2 2019 Form 10-Q claimed that Exelon's risk factors were "consistent with the risk factors described in [Exelon and ComEd's] combined 2018 Form 10-K." The Q2 2019 Form 10-Q repeated the State Policy Solutions Statement and the CEPA Lobbying Statement described above. It also claimed that "*[u]nder FEJA*, energy efficiency revenue varies from year to year based upon fluctuations in the underlying costs, investments being recovered, and allowed [return on equity]. *Energy efficiency revenue increased during the three and six months ended June 30, 2019* as compared to the same period in 2018, primarily due to the impact of higher rate base[,]" without disclosing the role the bribery scandal played in the passage of FEJA.

## THE FALSE AND MISLEADING 2019 PROXY

65. On March 20, 2019, Exelon filed its combined annual Proxy Statement on Schedule 14A (the "2019 Proxy") with the SEC that was solicited to stockholders "on behalf of the Board of Directors" (including defendant Crane).

66. Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

67. The 2019 Proxy again directed investors to Exelon's Code on the website, which was false and misleading as described above.

68. The 2019 Proxy highlighted supposed "Board [a]ccountability" by claiming that:

The Board regularly reviews management's systematic approach to identifying and assessing risks faced by Exelon and each business unit, taking into account emerging trends and developments and in connection with capital investments and business opportunities.

\*      \*      \*

The Company and its business units/operating companies also have Risk Management Committees composed of select senior officers including the chief executive officers of those business units/operating companies and the Exelon CEO, who meet regularly to discuss matters related to enterprise risk management generally, risks associated with new developments or proposed transactions under consideration, and ensure that processes are in place to identify and assess risks within the business as well as measure and manage risk exposures in accordance with Exelon's policies, programs, strategies, and risk appetite as approved by the Exelon Board.

69.     The 2019 Proxy harmed Exelon by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect the members of the Board, including defendant Crane.

## THE TRUTH SLOWLY EMERGES

70.     On July 15, 2019, Exelon filed a combined Current Report on Form 8-K announcing that Exelon and ComEd "*received a grand jury subpoena* from the U.S. Attorney's Office for the Northern District of Illinois *requiring production of information concerning their lobbying activities in the State of Illinois*. The Companies have pledged to cooperate fully and are cooperating fully with the U.S. Attorney's Office in expeditiously providing the requested information."

71.     On July 18, 2019, the *Chicago Tribune* published an article titled "FBI Raids Downstate Home of Longtime ComEd Lobbyist Who Is Close Confidant of Speaker Madigan." The ComEd lobbyist was McClain. The article stated, "McClain was a point man in the discussions about major ComEd and parent company Exelon legislation for decades. He retired as a lobbyist shortly after the passage of legislation in December 2016 that raised electricity rates on Illinois residents and businesses to help bail out a pair of Exelon's nuclear power plants."

72. On this news, Exelon's market capitalization plunged $1.1 billion, going from $48.76 per share to $47.57 per share in a single day.

73. On October 15, 2019, the Company announced that defendant Pramaggiore was leaving the Company. On this news, the Company's stock price fell from $47.06 per share to $44.91 per share, erasing another $2 billion in market capitalization in a single day.

## DAMAGES TO EXELON

74. As a result of the Individual Defendants' improprieties, Exelon engaged in a rampant bribery scheme, its subsidiary entered into the DPA, and the Company disseminated improper, public statements. These improper statements have devastated Exelon's credibility as reflected by the Company's over $6.6 billion, or 13.4%, market capitalization loss.

75. Exelon's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Exelon's current and potential customers consider whether a company achieves its revenues legally. Exelon's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

76. Further, as a direct and proximate result of the Individual Defendants' actions, Exelon has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying the settlement of the government investigation;

(b) costs incurred from implementing the DPA;

(c)     costs incurred from lavishing unwarranted gifts on Madigan and his cronies;

(d)     costs incurred from defending and paying any settlement in the class action for violations of federal securities laws; and

(e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Exelon.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

77.     Plaintiff brings this action derivatively in the right and for the benefit of Exelon to redress injuries suffered, and to be suffered, by Exelon as a direct result of breach of fiduciary duty, unjust enrichment, and violation of securities law, as well as the aiding and abetting thereof, by the Individual Defendants.  Exelon is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.     Plaintiff will adequately and fairly represent the interests of Exelon in enforcing and prosecuting its rights.

79.     Plaintiff was a stockholder of Exelon at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Exelon stockholder.

80.     On August 11, 2020, plaintiff sent the Board of Exelon the Demand detailing the wrongdoing explained herein and demanding that the Board investigate and the initiate litigation against the culpable fiduciaries.  A true and correct copy of the Demand is attached hereto as Exhibit A.

81.     Plaintiff received a short response letter from Exelon's in-house counsel on September 1, 2020.  Counsel confirmed receipt of the Demand and that the Board intended to consider the Demand at its next meeting.  Counsel also requested that plaintiff provide proof

concerning the dates and amounts of Exelon stock purchases by plaintiff. A true and correct copy of the September 1, 2020 letter is attached hereto as Exhibit B.

82.     Plaintiff responded on September 2, 2020. Though there is no requirement that plaintiff provide the requested proof, he provided an enclosure with his letter proving that he was a continuous and long-term Exelon stockholder. A copy of the September 2, 2020 letter is attached hereto as Exhibit C.

83.     Between the end of 2020 and the first quarter of 2021, plaintiff's counsel and the Company's internal counsel discussed the Board forming a demand review committee to consider the Demand. On April 5, 2021, plaintiff received a letter from counsel purporting to represent a "Special Litigation Committee" that the Board formed to consider the Demand. A true and correct copy of the April 5, 2021 letter is attached hereto as Exhibit D.

84.     On April 28, 2021, plaintiff's counsel wrote to the SLC's counsel. Plaintiff requested that the SLC provide him with an update on what steps the SLC had taken to preserve the Company's claims in light of any potential statute of limitation issue. Plaintiff noted that the claims were particularly strong in this instance in light of Judge Kendall's decision to deny the motions to dismiss the securities class action. A true and correct copy of the April 28, 2021 letter is attached hereto as Exhibit E.

85.     Counsel for the SLC responded on May 7, 2021. Counsel stated that the SLC had taken no steps to preserve the Company's valuable claims, despite the substantial passage of time, and no intention of taking any further steps to preserve such claims. A true and correct copy of the May 7, 2021 letter is attached hereto as Exhibit F.

86.     Pennsylvania has adopted certain sections of the American Law Institute Principles of Corporate Governance: Analysis and Recommendations ("ALI Principles"). Concerning

derivative actions, Pennsylvania has specifically adopted ALI Principles sections 7.02-7.10 and

7.13. *Cuker v. Mikalauskas*, 547 Pa. 600, 614, 692 A.2d 1042, 1049 (1997)

87. ALI Principles section 7.03 addresses the requirement that stockholders make a

demand on the Board before instituting a derivative action. In particular, section 7.03 states, in

relevant part:

> (a) Before commencing a derivative action, a holder or a director should be required
> to make a written demand upon the board of directors of the corporation, requesting
> it to prosecute the action or take suitable corrective measures, unless demand is
> excused under § 7.03(b). The demand should give notice to the board, with
> reasonable specificity, of the essential facts relied upon to support each of the
> claims made therein.

*     *     *

> (c) Demand on shareholders should not be required.

> (d) Except as provided in § 7.03(b), the court should dismiss a derivative action that
> is commenced prior to the response of the board or a committee thereof to the
> demand required by § 7.03(a), ***unless the board or committee fails to respond
> within a reasonable time***.

88. Here, the Board has failed to respond to plaintiff's Demand in a reasonable time.

Ten months have passed since plaintiff's counsel sent the Demand to the Board. Comment (f) to

ALI Principles section 7.03 provides sixty days as an example of a reasonable amount of time to

respond, and explicitly states that a delay of six months or more "would often prejudice the

plaintiff." The comment continues that "If the corporation fails to undertake ***and complete*** its

inquiry within a reasonable period following demand (***which period should never exceed several

months even when a study is undertaken and seldom should be that long***), the plaintiff may file

the action, and it should not be deemed premature." The Board's inquiry has improperly lasted

more than several months (indeed, lasting more than ten months). In addition, the SLC shows no

sign of concluding its investigation in the near future. Accordingly, plaintiff has satisfied

Pennsylvania's demand requirement, and may pursue this action on behalf of the Company.

89.     Further, the SLC and Board have failed to take steps to preserve the Company's claims, despite the potential running of the statute of limitations.  Accordingly, the Board and SLC's refusal to consider plaintiff's Demand in a timely and appropriate manner and to take steps to protect Exelon's claims amounts to a wrongful refusal of the Demand and justifies the filing of this action.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

90.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.     The Individual Defendants owed and owe Exelon fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Exelon the highest obligation of care and loyalty.

92.     The Individual Defendants and each of them, violated and breached their fiduciary duties.

93.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Exelon has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

94.     Plaintiff, on behalf of Exelon, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Exelon.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Exelon.

97.     Plaintiff, as a stockholder and representative of Exelon, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

98.     Plaintiff, on behalf of Exelon, has no adequate remedy at law.

## COUNT III

**Against the Defendant Crane for Violation of Section 14(a) of the Exchange Act**

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the defendant Crane.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

101.    Defendant Crane negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy.  In the 2019 Proxy, the Board solicited stockholder votes to reelect certain directors to the Board.  The 2019 Proxy, however, misrepresented and failed to disclose the illegal bribery

conspiracy and the Company's inadequate internal controls which facilitated the illegal behavior detailed herein. By reasons of the conduct alleged herein, defendant Crane violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, the 2019 Proxy contained misleading statements that were essential links in stockholders heeding defendant Crane and the Board's recommendation to reelect certain Board members.

102. The misleading information contained in the 2019 Proxy was material to Exelon's stockholders in determining whether or not to elect these defendants. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the 2019 Proxy were essential links in the reelection of nominees to the Board.

103. Plaintiff, on behalf of Exelon, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2019 Proxy in connection with the improper reelection of the members of the Board.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Exelon, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of fiduciary duty, unjust enrichment, and violation of securities law;

B. Directing Exelon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Exelon and its stockholders from a repeat of the damaging events described herein;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Exelon has an effective remedy;

      D.      Awarding to Exelon restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants,

      E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 8, 2021                 **MOTHERWAY & NAPLETON, LLP**

                                 */s/ Dominic C. LoVerde*

                                 DOMINIC C. LOVERDE

                               140 S. Dearborn Street, Suite 1500
                               Chicago, IL 60603
                               Telephone: (312) 726-2699
                               Facsimile: (312) 726-6851
                               Illinois Bar No. 6324263
                               E-mail: dloverde@mnlawoffice.com

                               ROBBINS LLP
                               BRIAN J. ROBBINS
                               STEPHEN J. ODDO
                               ERIC M. CARRINO
                               5040 Shoreham Place
                               San Diego, CA 92122
                               Telephone: (619) 525-3990
                               Facsimile: (619) 525-3991
                               E-mail: brobbins@robbinsllp.com
                                         soddo@robbinsllp.com
                                         ecarrino@robbinsllp.com

                               Attorneys for Plaintiff

1522690