UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| IN RE EXELON CORPORATION | ) | Case No. 1:21-cv-03611 |
| DERIVATIVE LITIGATION | ) | |
| | ) | Hon. John Robert Blakey |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF OPPOSING PLAINTIFFS'
OMNIBUS OPPOSITION TO RENEWED MOTION FOR PRELIMINARY APPROVAL
<u>OF DERIVATIVE SETTLEMENT</u>**

<span style="color:red">REDACTED - PROVISIONALLY FILED UNDER SEAL PURSUANT TO LOCAL RULE
26.2 AND THE AGREED CONFIDENTIALITY ORDER (ECF NO. 142)</span>

## TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................1

II.   RELEVANT BACKGROUND ............................................................................5

     A.    Exelon and Its Shareholders Suffer Hundreds of Millions in Measurable
         Damages as a Direct Result of the Bribery Scandal ................................5

     B.    The Shareholder Demand Letters ...........................................................7

     C.    The SLC Formation and Investigation......................................................7

     D.    The Derivative Actions ............................................................................8

     E.    The Mediations and Settlement Negotiations .........................................8

     F.    The SLC Pivots to Negotiating a Settlement with the Settling Shareholders
         on the Same Terms that Had Been Rejected.............................................9

     G.    The Parallel Securities Action and $173 Million Settlement................10

     H.    The SLC Files the Notice of Determination .........................................10

     I.    The Settling Shareholders File the *Dybas* Action.................................11

     J.    The IRC and the Board Approve the Settlement without Receiving the
         SLC Report ............................................................................................11

     K.    The Settling Parties File the Preliminary Approval Motion and the Court
         Grants Limited Discovery......................................................................12

III.   THE STANDARD FOR APPROVAL OF DERIVATIVE SETTLEMENTS.................13

     A.    Rule 23.1 Requires Courts to Carefully Scrutinize Whether the Terms of a
         Proposed Derivative Settlement are Fair, Reasonable, and Adequate..................13

     B.    Legal Standard for Preliminary Approval...............................................16

IV.   THE PROPOSED SETTLEMENT DOES NOT SATISFY RULE 23.1 AND IS
     NOT FAIR, REASONABLE, AND ADEQUATE .........................................17

     A.    The Settling Parties' Highly-Questionable Conduct Demonstrates
         Preliminary Approval Should Be Denied ............................................17

     B.    The Monetary Component of the Settlement Is Woefully Inadequate and
         Does Not Support Preliminary Approval................................................22

1. The Settlement's $40 Million Payment Is Illusory and Provides No Independent Value ........................................22

2. The Amount Offered in the Settlement Pales in Comparison to the Measurable Damages Incurred by Exelon ................................26

3. ████████████████████████████████ ████████████████ ........................27

4. ████████████████████████████████ ███████████ ........................31

5. Defendant Crane's Compensation Reduction Demonstrates the Settlement Is Unreasonable ........................................36

6. The Clawback Arrangements Demonstrate the Settlement Is Unreasonable ........................................37

C. The Stage of Proceedings and Amount of Discovery Completed ........................38

D. Complexity, Length, and Expense of Further Litigation ........................41

E. The Amount of Opposition to the Settlement ........................42

F. The Opinion of Competent Counsel ........................42

V. Opposing Plaintiffs Maintain Standing While the Settling Shareholders Lack Standing ........................................42

VI. The Proposed Notice Is Deficient Under Rule 23.1 ........................44

VII. CONCLUSION ........................45

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barovic v. Ballmer*,
　72 F. Supp. 3d 1210 (W.D. Wash. 2014)...............................................................40

*Besthoff on behalf of World Water Works Holdings, Inc. v. Mitta*,
　No. CV171449JMVMF, 2018 WL 3425733 (D.N.J. July 16, 2018) ....................41

*Colan v. Monumental Corp.*,
　524 F. Supp. 1023 (N.D. Ill. 1981) ......................................................................14

*Cuker v. Mikalauskas*,
　547 Pa. 600 (1997).................................................................................................42

*Davidowitz v. Edelman*,
　153 Misc.2d 854 (N.Y. Sup. Ct. 1992) .................................................................40

*Dorvit v. Winemaster*,
　950 F.3d 984 (7th Cir. 2020) .....................................................................14, 15, 22

*Employees Retirement System of the City of St. Louis v. Jones*,
　No. 2:20-CV-4813, 2022 WL 14160253 (S.D. Ohio Aug. 23, 2022) .......... *passim*

*Eubank v. Pella Corp.*,
　753 F.3d 718 (7th Cir. 2014) ............................................................................5, 45

*Gautreaux v. Pierce*,
　690 F.2d 616 (7th Cir.1982) ..................................................................................22

*In re Gen. Motors Corp. Engine Interchange Litig.*,
　594 F.2d 1106 (7th Cir. 1979) ...............................................................................16

*Hasan v. CleveTrust Realty Invs.*,
　729 F.2d 372 (6th Cir. 1984) .................................................................................40

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*,
　270 F.R.D. 330, 346 (N.D. Ill. 2010).....................................................................17

*In re HQ Sustainable Maritime Industries, Inc., Derivative Litigation*,
　No. C11-0910RSL, 2013 WL 3191867 (W.D. Wash. June 20, 2013) ...........24, 25

*In re McKesson Corp. Derivative Litig.*,
　No. 4:17-CV-01850-CW, 2020 WL 13577438 (N.D. Cal. Apr. 22, 2020) ...........15

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*,
  314 F.R.D. 580 (N.D. Ill. 2016) ..................................................................16, 17, 42

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*,
  No. 13 C 9116, 2014 WL 7237208 (N.D. Ill. Dec. 17, 2014) ................................21

*In re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Litig.*,
  No. 13-cv-09116, 2014 WL 3909180 (N.D. Ill. July 29, 2014) ............................21

*In re Par Pharm., Inc. Derivative Litig.*,
  750 F. Supp. 641 (S.D.N.Y. 1990) ........................................................................19

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
  869 F.3d 551 (7th Cir. 2017) .................................................................................21

*In re UnitedHealth Grp., Inc. S'holder Derivative Litig.*,
  631 F. Supp. 2d 1151 (D. Minn. 2009) ..................................................................15

*In re Wendy's Co. S'holder Derivative Action*,
  No. 1:16-CV-1153, 2020 WL 13169460 (S.D. Ohio Jan. 24, 2020) ......................45

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
  877 F.3d 276 (7th Cir. 2017) .................................................................................22

*Larson v. Dumke*,
  900 F.2d 1363 (9th Cir. 1990) ...............................................................................43

*Liebman v. J. W. Petersen Coal & Oil Co.*,
  73 F.R.D. 531 (N.D. Ill. 1973) ........................................................................16, 21

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) .................................................................................45

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) .................................................................................13

*Remijas v. Neiman Marcus Grp., LLC*,
  341 F. Supp. 3d 823 (N.D. Ill. 2018) ....................................................................36

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) ......................................................................16, 20, 21

*Robert F. Booth Tr. v. Crowley*,
  687 F.3d 314 (7th Cir. 2012) ...........................................................................13, 16

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) ...............................................................38, 39

*Sutherland v. Sutherland,*
    958 A.2d 235 (Del. Ch. 2008) .................................................................................39

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) .......................................................................22, 27

*United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.,*
    447 F.2d 647 (7th Cir. 1971) .......................................................................13

*Wert v. Cohn,*
    No. 17 C 219, 2018 WL 6839856 (N.D. Ill. Dec. 31, 2018) ..........................14, 16

*Williams v. Rohm & Haas Pension Plan,*
    658 F.3d 629 (7th Cir. 2011) .......................................................................21

**Statutes**

Delaware Code § 145(a) .................................................................................34

1 Pa.C.S.A. §1939.................................................................................35

15 Pa.C.S.A. §1742.................................................................................34

15 Pa.C.S.A. §1746.................................................................................32, 34, 35

15 Pa.C.S.A §1781.................................................................................42

15 Pa.C.S.A §1782.................................................................................43, 44

15 Pa.C.S.A §1783.................................................................................*passim*

**Rules**

Federal Rules of Civil Procedure
    Rule 23.1 .................................................................................*passim*
    Rule 23 .................................................................................45

On October 26, 2023, the Special Litigation Committee ("SLC") of Exelon Corporation's ("Exelon") Board of Directors ("Board") filed its Renewed Motion for Preliminary Approval of Derivative Settlement, while the other Settling Parties filed supporting materials (ECF Nos. 146-1, 152, 153) (together, the "Motion"), seeking approval of the Settlement.[1]  In accordance with the Court's order dated November 14, 2023 (ECF No. 164), Opposing Plaintiffs[2] respectfully submit this omnibus response and request that the Court deny the Motion for the reasons set forth herein.

## I.  INTRODUCTION

When Opposing Plaintiffs requested that the Court order discovery in connection with its consideration of the SLC's initial motion for preliminary approval, they harbored significant reservations about the viability of the Settlement and the value—or lack thereof—it provided to Exelon and its shareholders.  With the benefit of that limited discovery, those concerns are now manifest in what Opposing Plaintiffs believe strongly is a patently unfair, inadequate and unreasonable Settlement that should be rejected by this Court.

The discovery confirms that the so-called monetary benefit of $40 million at the heart of the Settlement is—in reality—nothing more than a double-counting of $30 million of insurance proceeds already pledged and dispersed to fund the settlement reached in the federal securities class action, captioned *Flynn v. Exelon Corporation*, No. 1:19-cv-08209 (N.D. Ill.) ("Securities Action"), plus $10 million in attorneys' fees for the Settling Shareholders.  Indeed, Exelon has already publicly disclosed in filings with the U.S. Securities and Exchange Commission ("SEC")

---

[1] All capitalized terms not defined herein shall have the same meaning as ascribed in the Motion and Stipulation and Agreement of Settlement ("Stipulation" or "Stip.") (ECF No. 144-1).  Here, as throughout, all emphasis is added and citations and footnotes are omitted unless otherwise noted.  Citations to "SLC Br." refer to ECF No. 144; "Exelon Br." refer to ECF No. 152; "IRC Br." refer to ECF No. 153; and, "SH Br." refer to ECF No. 146-1.

[2] "Opposing Plaintiffs" are plaintiffs James Clem, Coral Springs Police Officers' Pension Plan, Donna M. Nicosia, Melvin Peller, and Pinchas E. Raul.

that the $173 million Securities Action settlement "***was fully covered by insurance and has been***

***paid in full***," which demonstrates conclusively that the $30 million was going to be paid to the

Securities Action settlement regardless of whether the Settlement here is approved.[3]

Also troubling, as proven by the discovery, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

The end result was that while the special litigation committee and plaintiffs in *Employees*

*Retirement System of the City of St. Louis v. Jones*, No. 2:20-CV-4813, 2022 WL 14160253 (S.D.

Ohio Aug. 23, 2022) ("*FirstEnergy*") were able to secure more than 80 percent of the available

coverage to settle the derivative claims, here, by contrast, the Settling Parties only secured the $10

million in attorneys' fees which provides no benefit to Exelon, and even if it did, represents ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

---

[3] Exelon Corporation, Quarterly Report (Form 10-Q), at 99 (Nov. 2, 2023), available online at https://www.sec.gov/ix?doc=/Archives/edgar/data/8192/000110935723000097/exc-20230930.htm ("Form 10-Q").



In minimizing Exelon's <u>admitted</u> wrongdoing, the Settling Parties gloss over that here, unlike in *FirstEnergy*, where the company's executives have not yet been criminally charged, several former Exelon/ComEd executives were tried and found guilty of violations of positive law. They also ignore that just recently, on September 28, 2023, Exelon <u>admitted</u> to federal securities law violations related to the bribery scheme and agreed to pay a $46.2 million penalty after a lengthy SEC investigation.[4] The SEC has not assessed similar charges or penalties against FirstEnergy.

Although the eye-test negates that the settlement of this Action should have proceeded any

---

[4] *See* Order Instituting Cease-and-Desist Proceedings, *In re of Exelon Corp. & Commonwealth Edison Co.*, Securities Act of 1933 Release No. 11248, Securities Exchange Act of 1934 Release No. 98616, Accounting & Auditing Enforcement Release No. 4467, Administrative Proceeding File No. 3-21761 (Sept. 28, 2023), https://www.sec.gov/files/litigation/admin/2023/33-11248.pdf ("SEC Order").

differently than *FirstEnergy*, from the beginning, the SLC—the entity created by Exelon's Board to investigate the wrongdoing and advocate for as large a recovery as possible for Exelon—instead sought a coalition of the willing to endorse a settlement that provided no monetary recovery for the Company. Indeed, the SLC's approach was designed to get rid of this litigation on terms favorable to the Individual Defendants and to do so in a way (it hoped) would avoid any scrutiny.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

Aside from the inadequacy of the Settlement consideration, the manner in which the Settling Parties have sought Settlement approval should give the Court pause. ████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[5] The portions of the *Dybas* Action complaint that address derivative standing remain inexplicably redacted. *Dybas* Action, ECF No.1, ¶¶197-201.

███████████████████████████████████

And second, the SLC initially moved for preliminary approval of the Settlement contending that Pennsylvania law required the Court to ignore the requirements of Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1") and to merely rubber-stamp the SLC's determination that the Settlement was in the best interests of Exelon and its shareholders. While the SLC seems to have changed its tune in the renewed Motion, the fact remains that this Settlement does not meet even the criteria for preliminary approval of derivative settlements. And the Settling Parties still request that the Court boldly go where no other court has gone before—asking that it approve a settlement negotiated by Exelon representatives between themselves and then endorsed by manufactured "plaintiffs" who have no case or controversy before this Court.

In fact, as confirmed by the limited discovery and set forth in much more detail herein, the Settlement, and the process leading up to it, flash "almost every danger sign" that the Seventh Circuit has "warned district judges to be on the lookout for" when evaluating representative settlements. *Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014). Accordingly, Opposing Plaintiffs respectfully request that the Court deny with prejudice the Motion.

## II.    RELEVANT BACKGROUND

### A.    Exelon and Its Shareholders Suffer Hundreds of Millions in Measurable Damages as a Direct Result of the Bribery Scandal

For nearly a decade, officials at ComEd/Exelon illegally bribed the Speaker of the Illinois House of Representatives and others in his orbit in exchange for favorable legislative actions that resulted in hundreds of millions in ill-gotten gains for ComEd/Exelon. This wrongdoing, and the resulting damage to Exelon (and shareholders), are neither speculative nor attenuated—rather, they are corroborated by admissions in charging documents, multiple high-profile resignations, plea deals, and criminal convictions, as well as hundreds of millions of dollars in fines and settlements.

On July 17, 2020, the U.S. Attorney for the Northern District of Illinois, John R. Lausch, Jr. ("Lausch"), announced the deferred prosecution agreement (the "DPA"), detailing the scheme.[6] In exchange for deferring prosecution, ComEd admitted to all of the misconduct alleged therein, and, along with Exelon, agreed to pay a $200 million fine, which it was barred from offsetting through ratepayer increases. In August 2022, Exelon/ComEd agreed to pay an additional $38 million to the Illinois Commerce Commission ("ICC") related to the bribery scandal.[7]

In September 2020, Fidel Marquez, a former ComEd official, pled guilty to bribery charges. In November 2020, several ComEd/Exelon fiduciaries and third parties that led the bribery scheme were criminally charged for their role in the scheme, including Anne Pramaggiore and John Hooker. After a trial spanning weeks, each of the members of the "ComEd Four" (Pramaggiore, Hooker, lobbyist Michael McClain, and consultant Jay Doherty) were found guilty.[8]

On September 28, 2023, Exelon agreed to pay a $46.2 million civil penalty following an SEC investigation that found "violations" of several "provisions of the Securities Act and the Exchange Act" as a result of the "multi-year scheme by ComEd to corruptly influence and reward [Michael Madigan], ..., for his assistance with respect to legislation affecting ComEd's business."[9]

---

[6] ECF No. 144-2 at Ex. 1, Deferred Prosecution Agreement.

[7] Jim Chilsen, *ICC orders $38 million ComEd scandal refund – a step forward, but not enough*, Citizens Utility Board, Aug. 19, 2022, https://www.citizensutilityboard.org/blog/2022/08/19/icc-orders-38-million-comed-scandal-refund-a-step-forward-but-not-enough/.

[8] Jason Meisner, et al., *Defendants found guilty on all counts in 'ComEd Four' trial; juror says panel wanted 'politics to run in a correct manner'*, Chicago Tribune, May 2, 2023, https://www.chicagotribune.com/news/criminal-justice/ct-comed-four-bribery-trial-verdict-madigan-20230502-ykjanxkczveudny7v4fci5bsqy-story.html.

[9] *See* SEC Order, *supra* n.4. Not surprisingly, the SLC's renewed Motion does not discuss the SEC fine, or Exelon's admitted securities law violations, neither of which were factored into the Settlement.

### B.    The Shareholder Demand Letters

Between August 2020 and March 2023, Opposing Plaintiffs (Clem, Peller, Raul, Nicosia, and Coral Springs) sent letters demanding to inspect corporate books and records pursuant to 15 Pa.C.S.A §1508 and/or demanding that the Board investigate and pursue claims against Exelon's current and former officers and directors pursuant to 15 Pa.CS.A §1781.  The Settling Shareholders (Dybas, Grunze and Wax) also sent letters demanding to inspect corporate books and records and/or litigation demands.  However, Settling Shareholders Grunze and Wax did not take any action until after plaintiff Clem initiated this Action.  Stip. at 4.

### C.    The SLC Formation and Investigation

In written consents executed on March 1-2, 2021, the Board authorized the formation of the SLC in response to the demand letters, but only authorized it to "make recommendations to the full Board of Directors[.]"  Stip. at 3-4.  On July 19-20, 2022, the Board formed the IRC to oversee negotiations with the SLC but only authorized it to "make a recommendation to the Board" regarding whether to accept or reject any report by the SLC or decision to settle any actions.  *Id.*

The SLC's investigation was open for over two years.  Yet, it did not create a written report (the "SLC Report") until at least several months *after* it had already agreed to settlement terms with the IRC, two months *after* it had reached the agreement with the Settling Shareholders, and almost a month *after* it had filed the Notice of Determination and Intent to Seek Court Approval of Settlement ("Notice of Determination").  ECF No. 54.

The SLC Report, which seeks to justify the SLC's refusal to pursue the derivative claims and its decision to accept the Settlement, contains no details as to the SLC's actual investigation or findings.  *See* SLC Br., Ex. B.  Instead, the SLC Report—like the SLC's Motion—notes how many documents it purportedly reviewed, but offers no insight into what topics those documents covered, or how they relate to the strengths or weaknesses of the derivative claims that would be released

by the Settlement.  Likewise, while the SLC says it conducted "interviews," the SLC Report does not disclose the identities of those interviewed, much less the topics covered.  *Id*. at 13-14, 44-46.

### D.    The Derivative Actions

On July 8, 2021, plaintiff Clem initiated this derivative action (the "*Clem* Action").  He filed the *Clem* Action to preserve Exelon's valuable derivative claims after having been told that the SLC had no intention of taking action despite impending statute of limitations deadlines, which amounted to a wrongful refusal of his demand.  *See* ECF No. 1, ¶¶77-89.  The below actions were filed by the other Opposing Plaintiffs and have since been consolidated (ECF Nos. 50, 121, 164):

- *Nicosia v. Young*, No. 1:23-cv-02605 (N.D. Ill. Apr. 26, 2023) ("*Nicosia* Action");
- *City of Coral Springs Police Officers' Pension Plan v. Young*, No. 1:23-cv-02712 (N.D. Ill. May 1, 2023) ("*Coral Springs* Action");
- *Peller v. Anderson*, No. 1:23-cv-04206 (N.D. Ill. June 29, 2023) ("*Peller* Action"); and
- *Raul v. Crane*, 1:23-cv-14748 (N.D. Ill. Oct. 11, 2023) ("*Raul* Action").

### E.    The Mediations and Settlement Negotiations

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

░░░░░███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

**F.** **The SLC Pivots to Negotiating a Settlement with the Settling Shareholders on the Same Terms that Had Been Rejected**

░░░░░███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

░░░░░███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[10] SLC Br., Ex. D, ¶25.



### G. The Parallel Securities Action and $173 Million Settlement

At the very same time that the Settling Parties were purportedly "negotiating" the Settlement and attorneys' fees, several of the exact same individuals and entities—including Judge Phillips, several defendants, Exelon's Board, and Exelon's insurers—were directly involved in the ongoing negotiations to resolve the Securities Action.

As outlined in documents filed in support of that settlement, on April 21, 2023, the parties in the Securities Action participated in a mediation session with Judge Phillips but did not reach an agreement. Securities Action, ECF No. 192 at 8. However, on April 22, 2023, Judge Phillips issued a "mediator's recommendation" to settle the Securities Action for $173 million, which the parties accepted on April 26, 2023. *Id.* On May 3, 2023, the parties in the Securities Action announced the $173 million settlement. Exelon's insurance has already funded the entirety of the $173 million settlement, which was granted final approval by District Judge Virginia M. Kendall on September 8, 2023. Securities Action, ECF Nos. 217, 219.

### H. The SLC Files the Notice of Determination

On May 26, 2023, days before the parties in the *Clem* Action had to file the status report concerning settlement negotiations (*see* ECF No. 44), and a month before the SLC Report was eventually completed, the SLC abruptly filed the Notice of Determination revealing it had agreed to the Settlement. ECF No. 54. The Notice of Determination did not provide any details about

the Settlement's terms or the negotiations. The same day, the SLC sent a letter to both Opposing Plaintiffs and Settling Shareholders informing them that the Board had rejected the demands and decided not to commence litigation (the "SLC Determination Letter").[11]

## I.    The Settling Shareholders File the *Dybas* Action

On May 25, 2023, just one day before the SLC filed the Notice of Determination and sent the SLC Determination Letter, the Settling Shareholders filed their initial stockholder derivative complaint. The complaint makes no reference to the fact that the Settling Shareholders had already agreed to resolve all of the derivative claims asserted in the lawsuit a month earlier. *Dybas* Action, ECF Nos. 1, 5. Moreover, even though Pennsylvania has adopted a universal demand requirement, the *Dybas* Action complaint does not appear to allege that the Settling Shareholders' litigation demands were wrongfully refused, which is a prerequisite for a shareholder-plaintiff to obtain standing to commence a derivative lawsuit. And as discussed *infra* §IV.A., the very limited discovery received by Opposing Plaintiffs demonstrates ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## J.    The IRC and the Board Approve the Settlement without Receiving the SLC Report

The Settlement was agreed to on April 24, 2023, and memorialized in a term sheet dated May 1, 2023 (the "Term Sheet").[12] On May 18, 2023, the SLC approved a resolution reflecting its recommendation to settle and dismiss the derivative claims. Stip. at 12-13. The next day, the

---

[11] *See* Declaration of Stephen J. Oddo in Support of Opposing Plaintiffs' Omnibus Opposition to Renewed Motion for Preliminary Approval of Derivative Settlement ("Oddo Decl."), Ex. B filed concurrently herewith.
[12] Oddo Decl., Ex. C, Settlement Term Sheet.

IRC recommended that the Board approve the SLC's recommendation. *Id.* On May 22, 2023, the Board adopted the recommendations of the SLC and IRC. *Id.* On June 9, 2023, the Settling Parties executed the Stipulation. Critically, at the time Exelon's Board adopted the recommendations, it had not yet received, much less reviewed, the SLC Report. In fact, the SLC Report would not be completed until June 13, 2023, or several days *after* the Settling Parties executed the Stipulation. The IRC and Exelon's Board did not receive the SLC Report until June 14 and 15, respectively, mere days before the SLC's initial Motion for Preliminary Approval was filed.[13] ECF No. 71 at 4.

### K. The Settling Parties File the Preliminary Approval Motion and the Court Grants Limited Discovery

On June 16, 2023, the SLC filed its Motion for Preliminary Approval, supported by all the Settling Parties. ECF Nos. 72, 76-78. Relying entirely on 15 Pa.C.S.A. §1783 ("Section 1783"), which was only enacted in 2017, the Settling Parties claimed that the Court was required to enforce the SLC's determination and approve the Settlement under Rule 23.1(c) without any reference to whether the Settlement's terms were fair, reasonable, or adequate. ECF No. 72 at 4-7.

On July 21, 2023, Opposing Plaintiffs filed their Motion for Limited Discovery on the grounds that the Court did not have sufficient information to evaluate the Settlement, and that the Settling Parties failed to disclose material terms of the Settlement and the negotiations that preceded it. ECF No. 115. The Court held a hearing on August 31, 2023, during which it heard arguments regarding the controlling standard of law for preliminary approval and the appropriate scope of discovery. During the hearing, as suspected by Opposing Plaintiffs all along, counsel for Exelon admitted, in response to questions from the Court, that $30 million of the Settlement's $40 million monetary component consists of funds that have already been allocated to resolve the

---

[13] Opposing Plaintiffs remain unaware of any other instance, where, as here, a board of directors accepted and implemented a special litigation committee's recommendations to settle and/or dismiss derivative claims ***before*** learning of the complete results of its investigation.

Securities Action, with the remainder to fund the Settling Shareholders' attorneys' fees request.[14]

On September 7, 2023, the Court entered an Order denying the SLC's motion for preliminary approval without prejudice and directing the SLC to produce the Term Sheet and allowing other narrow settlement-related discovery. ECF No. 132 at 7. In denying the motion, the Court noted that neither Rule 23.1 nor Section 1783 "permits a rubberstamp [of the SLC's determination regarding the settlement], and both require the Court to assess the reasonableness of the SLC's determinations." *Id.* at 6.

## III. THE STANDARD FOR APPROVAL OF DERIVATIVE SETTLEMENTS

### A. Rule 23.1 Requires Courts to Carefully Scrutinize Whether the Terms of a Proposed Derivative Settlement are Fair, Reasonable, and Adequate

Under Rule 23.1(c), "[a] derivative action may be settled, voluntarily dismissed, or compromised **only with the court's approval**." Fed. R. Civ. P. 23.1(c). The Seventh Circuit has repeatedly emphasized that district courts play a pivotal role in evaluating representative settlements. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014) (when approving the settlement of a representative action the Court "is not to assume the passive role that is appropriate when there is genuine adverseness between the parties"). In fact, "[i]n Rules 23 and 23.1 cases, the district judge" is properly viewed as "a 'third party to the compromise.'" *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971).

Thus, under Rule 23.1, district courts <u>must</u> ensure that the terms of a proposed derivative settlement are in the best interests of the corporation (and its shareholders) and that the settlement is free from collusion and other inequitable conduct. *Robert F. Booth Tr. v. Crowley*, 687 F.3d 314, 318 (7th Cir. 2012) ("Rule 23.1(c) requires judicial approval of settlements in derivative suits precisely because the self-appointed investors may be poor champions of corporate interests and

---

[14] Oddo Decl., Ex. D at 36:2-37:21.

thus injure fellow shareholders."); *Wert v. Cohn*, No. 17 C 219, 2018 WL 6839856, at *3 (N.D. Ill. Dec. 31, 2018) ("In determining whether t[o] approve the settlement of a derivative action, the Court is 'required to exercise an informed judgment whether the proposed settlement is fair and reasonable in light of all the relevant factors,' … [and] reached free from collusion and fraud.").

District courts are required to perform this critical function because the decision to approve a derivative settlement under Rule 23.1 provides defendants with broad releases that foreclose forever the ability of the corporation (and individual shareholders) to pursue claims relating to the challenged wrongdoing.  As Senior District Judge Marvin Aspen aptly summarized, this broad preclusive effect makes it all the more important for district courts to scrutinize the terms of a proposed derivative settlement, as well as the conduct of the settlement's proponents:

> Res Judicata [] poses particular dangers in the derivative suit context. Because the corporation, and not the shareholder-plaintiff, is the real party in interest in a derivative action, ... an adjudication on the merits in one shareholder derivative suit will operate to bind all shareholders to the judgment in that case.... Since the first shareholder whose claim becomes final binds the rest, there is a special danger that a plaintiff suing derivatively will not, as Rule 23.1 requires, "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association," thus losing for the corporation forever the opportunity for a more favorable disposition of its claim. ***To protect the corporation against the loss of a valid claim by a plaintiff who is incompetent, in collusion with the wrongdoers, or who simply grows "faint-hearted" at the prospect of continued litigation***, Rule 23.1 requires that a derivative action not be "dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders in such manner as the court directs." Fed.R.Civ.P. 23.1.

*Colan v. Monumental Corp.*, 524 F. Supp. 1023, 1025 (N.D. Ill. 1981).

Courts fulfill Rule 23.1's mandate by uniformly applying the fair, reasonable, and adequate standard when evaluating the terms of proposed derivative settlements and the conduct of those who seek approval of such settlements, even when a special litigation committee is involved.  *E.g.*, *Dorvit v. Winemaster*, 950 F.3d 984, 988-90 (7th Cir. 2020) (affirming district court's use of fair,

- 14 -

reasonable, and adequate standard in approving derivative settlement under Rule 23.1(c)).[15]

The Settling Parties' renewed briefing in support of the Settlement appears—finally—to acknowledge that Rule 23.1 requires the Court to assess the terms of the Settlement to determine whether they are fair, reasonable, and adequate and in the best interests of Exelon and its shareholders. *See* SLC Br. at 4-15 (discussing the Settlement in the context of the factors used by courts in the Seventh Circuit to assess whether a settlement's terms are fair, reasonable, and adequate); IRC Br. at 4 ("The Settlement is eminently fair and reasonable").

That the Settling Parties have abandoned their insistence that Section 1783 requires the Court to simply defer to the SLC's determination without any consideration of the Settlement's terms makes sense. Although Section 1783 directs courts to determine whether a special litigation committee "made its determination or recommendation in good faith, independently and with reasonable care[,]" it does not specify what factors or evidence the court may consider to make such a determination. *See* Section 1783(f)(3). Further, Section 1783 does not state that in analyzing whether a committee's recommendation to settle was made "in good faith, independently and with reasonable care"—as required by the statute—the court must do so without any reference to the settlement terms or the circumstances of the settlement negotiations. And, more fundamentally, it remains unclear, how a court could ever conclude under Section 1783 that a settlement recommendation was made "in good faith, independently and with reasonable care" where the terms were not fair, reasonable, and adequate to the company and its shareholders.

---

[15] *See FirstEnergy*, 2022 WL 14160253, at *1-2 (evaluating whether terms of proposed derivative settlement were "'fair, reasonable, and adequate'" where "[a]ll parties in all shareholder derivative cases, as well as FirstEnergy's SLC" agreed to the settlement); *In re McKesson Corp. Derivative Litig.*, No. 4:17-CV-01850-CW, 2020 WL 13577438, at *2 (N.D. Cal. Apr. 22, 2020) (same); *In re UnitedHealth Grp., Inc. S'holder Derivative Litig.*, 631 F. Supp. 2d 1151 (D. Minn. 2009) (same).

### B.    Legal Standard for Preliminary Approval

In evaluating whether to grant preliminary approval, the Court has an obligation to determine whether the proposed settlement is a product of collusion or other inequitable conduct by the settling parties, and any indicia of such conduct should weigh strongly against preliminary approval.  *See Booth*, 687 F.3d at 318; *Wert*, 2018 WL 6839856, at *3 (under Rule 23.1(c) district court must assess "whether [settlement] was reached free from collusion and fraud").  In fulfilling this duty, the Court may not substitute "intuition for evidence and careful analysis[.]"  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (reversing district court's approval of settlement where "[a]lthough there [wa]s no proof that the settlement was actually collusive ... the circumstances demanded closer scrutiny than the district judge gave it."); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir. 1979) (reversing approval of settlement after concluding "the record [did not] adequately support[] the [district] court's conclusion that the seemingly irregular conduct of the negotiations did not prejudice the interests of the class.").

Once a district court is satisfied that a proposed settlement is not the product of collusive or inequitable conduct, it then turns to whether the terms are fair, reasonable, and adequate.  Courts in the Seventh Circuit review several non-exhaustive factors, including:  "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed."  *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, 314 F.R.D. 580, 588 (N.D. Ill. 2016) ("*NCAA*").

While preliminary approval is not a final determination that a settlement satisfies the above inquiry, "[t]here is no purpose served by sending out a proposed settlement to class members if it does not appear preliminarily to be within the range of an approvable proposal." *Liebman v. J. W.*

*Petersen Coal & Oil Co.*, 73 F.R.D. 531, 535 (N.D. Ill. 1973); *see also In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010) ("Although courts can later choose to deny final approval of a class settlement, they should not lightly give preliminary approval[.]"). Indeed, where, as here, "substantive objections are raised at the preliminary stage" it is "advisable for the court to engage in a more piercing and thorough analysis of the issues in the first instance, rather than waiting until the final approval hearing[.]" *NCAA*, 314 F.R.D. at 589.

## IV. THE PROPOSED SETTLEMENT DOES NOT SATISFY RULE 23.1 AND IS NOT FAIR, REASONABLE, AND ADEQUATE

### A. The Settling Parties' Highly-Questionable Conduct Demonstrates Preliminary Approval Should Be Denied

As noted above, the Court has an obligation to assess whether the Settlement is the product of collusion or other inequitable conduct. For months, Opposing Plaintiffs have worked to expose—for the benefit of Exelon's shareholders and the Court—the true nature of the Settlement and the troubling circumstances of the "negotiations" that preceded it. At every turn, Opposing Plaintiffs' efforts have yielded alarming facts about the Settling Parties' conduct and the illusory nature of the Settlement they agreed to—supposedly, on behalf of Exelon and its shareholders.

██████████████    ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

        ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

    Other new facts raise further questions about the Settling Parties' intentions.  Through discovery, Opposing Plaintiffs have learned that the Settlement was conditioned on an express agreement that the Settling Shareholders would commence the separate *Dybas* Action.  ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

        ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

        ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ █

██████████████████████████████

Unfortunately, a <u>litany</u> of other facts and circumstances present additional concerns about the Settling Parties' motives and whether the Settlement is in the best interest of Exelon and its shareholders, including, *inter alia*, that:

- the Board created the SLC to investigate the derivative claims but only vested it with the authority to make recommendations (*see In re Par Pharm., Inc. Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) ("[A] mere advisory role of the Special Litigation Committee fails to bestow sufficient legitimacy on the Board's decision to warrant deference to the Board by this Court."));

- the Board created the IRC more than a year after authorizing the SLC's investigation so that it could negotiate reforms with the SLC, rather than permit the SLC to negotiate reforms directly with plaintiff Clem and the demand shareholders (*supra* §II.C.);

- the Settling Parties ceased communications with Opposing Plaintiffs—despite working

---

[16] Also troubling, the SLC, in attempting to oppose discovery, represented that the decision to commence the *Dybas* Action "took place after the settlement" and therefore "ha[s] no bearing on whether the settlement was collusive (it was not)." ECF No. 122 at 15. However, the fact that filing the *Dybas* Action was a condition of the Settlement, as reflected in the Term Sheet, demonstrates that the SLC's prior representation was at best misleading.

jointly and cooperatively for months on a settlement framework—after the Proposal was rejected and did not inform Opposing Plaintiffs of subsequent "negotiations" (*supra* §II.F.);

- the SLC Report was not completed until after Exelon's Board and the IRC had already approved the SLC's recommendations to accept the Settlement and dismiss the derivative claims (*supra* §II.J.);

- ██████████████████████████████████████████████████ (*infra* §IV.B.; *Reynolds*, 288 F.3d at 284 (reversing approval of settlement where the record reflected "[a] pattern [by the settlement's proponents] of withholding information likely to undermine the settlement")); and

- the Settling Parties' failure to disclose a host of uncontested, material facts in the Proposed Notice of Settlement (*infra* §VI.).

The Settling Parties offer no explanation for any of the above conduct. Instead, they seek to cleanse the Settlement and the negotiations that preceded it by relying heavily on the declaration of Judge Phillips. Crucially, however, Judge Phillips' declaration was only prepared in connection with the Settling Parties' efforts to resist discovery *after* the Opposing Plaintiffs raised concerns about the Settlement and the Settling Parties' conduct. SLC Br., Ex. D., ¶1. Judge Phillips' declaration was <u>not</u> included in the Settling Parties' prior preliminary approval briefing. That the Settling Parties felt compelled to include it with the renewed Motion is tantamount to an acknowledgement that the precise circumstances of how the Settlement was reached are relevant to the Court's review and evaluation of the Motion.

While counsel for Opposing Plaintiffs have worked often with Judge Phillips, he acknowledges that his declaration reflects only the selective "procedural and substantive matters" that "the Settling Parties [have] authorized [him]" to disclose to the Court. *Id.*, ¶14. Further, Judge Phillips' principal objective was to reach a global resolution; he was not tasked with deciding what was fair, reasonable, and adequate for Exelon and its shareholders.

Additionally, while the presence of a mediator may weigh in favor of approval, it is by no means dispositive. For instance, in *NCAA*, District Judge John Z. Lee denied preliminary approval

of a proposed settlement, citing concerns about the adequacy of the proposed consideration, and directed the parties back to the negotiating table, even though at the time he denied the motion the parties had already participated in four prior mediations, three of which were overseen by Judge Phillips.[17]  *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Inj. Litig.*, No. 13 C 9116, 2014 WL 7237208 (N.D. Ill. Dec. 17, 2014) (denying preliminary approval); *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 554 (7th Cir. 2017) (reversing approval of settlement reached "[f]ollowing mediation" with Honorable Morton Denlow (ret.)).

These facts and circumstances, much of which have only come to light over the Settling Parties' vehement objections, are highly irregular and "demand[] closer scrutiny."  *See Reynolds*, 288 F.3d at 283; *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) ("A district court must take special care in performing this assessment when the proposed settlement evinces certain warning signs.").  These concerns are even more prescient, and warrant an even more exacting review by the Court, because they are raised not by outside objectors, but by Opposing Plaintiffs who lack any conceivable motive for opposing the Settlement other than believing a better deal for Exelon was—and still is—possible.  *See Liebman*, 73 F.R.D. at 534–35 (denying preliminary approval of representative settlement where plaintiffs in four out of six consolidated actions "object[ed] to the proposed settlement" and noting that "[t]heir 'business judgment' as well as their objections to the proposal [we]re also entitled to weight.").

Together, at a minimum, these facts should color the Court's analysis of the Settling Parties' various representations about the purported benefits of the Settlement, if not doom it altogether.

---

[17] *See In re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Litig.*, No. 13-cv-09116, 2014 WL 3909180, at Section I. Introduction (N.D. Ill. July 29, 2014).

**B.    The Monetary Component of the Settlement Is Woefully Inadequate and Does Not Support Preliminary Approval**

The Seventh Circuit has "repeatedly stated that '*[t]he most important factor* relevant to the fairness of a class action settlement is ... the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 284 (7th Cir. 2017) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)) (omission in original).  This factor is equally important in the context of a proposed derivative settlement.  In fact, in *Dorvit*, the Seventh Circuit assessed whether the district court properly determined that a proposed derivative settlement was fair, reasonable, and adequate by considering whether the "money damages" secured by the settlement "w[ere] insufficient when compared to the potential recovery should the derivative suit have proceeded."  950 F.3d at 989.

███████████████████████████████████████████████████████ █

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████The sheer insufficiency of the amount secured by the Settlement demonstrates that it is not "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir.1982).  Accordingly, the Motion should be denied.

**1.    The Settlement's $40 Million Payment Is Illusory and Provides No Independent Value**

The Settlement's purported $40 million monetary component is a fiction.  Through discovery—and over repeated objections from the Settling Parties—it has been revealed that $30 million of the Settlement's $40 million monetary component constitutes nothing more than a double-counting of insurance proceeds.  This $30 million confers <u>zero</u> independent benefit on

Exelon and its shareholders and provides <u>zero</u> recompense for the damage caused by the wrongdoing. Not only has this $30 million payment already been allocated to resolve the Securities Action, it also appears that these proceeds have already been paid to the claimants in that action. In fact, as confirmed by the discovery, the *only* independent contribution achieved by the Settlement is the $10 million in attorneys' fees sought by the Settling Shareholders (which benefits them and not Exelon), which remains subject to Court approval.

Forced now to admit that $30 million of the Settlement's $40 million monetary component is <u>not</u> separate and apart from the insurance money already paid to resolve the Securities Action, the SLC and the other Settling Parties insist it still provides "a substantial and *immediate* benefit" (SLC Br. at 8), asserting, incredulously, that this double-counting allowed "the Company ... to direct $30 million of the $40 million monetary component towards the settlement of the Securities Action." Exelon Br. at 6. That is nonsensical. As the proponents of the Settlement, Exelon and the other Settling Parties were required to demonstrate Exelon only received the $30 million in insurance proceeds because of *this* Settlement, or, stated differently, that the Company would not have otherwise received the $30 million but for *this* Settlement. The discovery received by Opposing Plaintiffs, however, demonstrates that they cannot do so.

First, the timing of the parallel settlement negotiations in this Action and Securities Action strongly suggests that the $30 million was *already* committed to the Securities Action settlement before the Settlement was agreed to here. *Supra* §II.G. On April 22, 2023, Judge Phillips issued a "mediator's recommendation" to settle the Securities Action for $173 million, which was communicated to Exelon, certain defendants in this Action, and Exelon's insurance carriers. That recommendation was accepted on April 26. Thus, when these same parties entered into the Settlement "negotiations" here that purportedly occurred on April 24 and 25 to resolve this Action, they already knew the amount that would be required to resolve the Securities Action and the date

when the funds would need to be fully-committed.

Further, even though this Court has not yet approved the Settlement (and should not do so), Exelon has *already* received the $30 million and has *already* used it to fund the Securities Action settlement.[18] The Settling Parties have not (and cannot) show that Exelon's insurers will demand the return of the $30 million in the event the Court declines to approve the Settlement. In fact, Exelon has already publicly disclosed in its SEC filings that the Securities Action settlement "***was fully covered by insurance and has been paid in full***[,]" demonstrating that there is no doubt that the $30 million in insurance funds will be available to fund that settlement <u>regardless</u> of whether this Settlement is approved by the Court.[19]

That the Settling Parties' representations are meritless, and that the $30 million provides no benefit, can be seen from the Securities Action record, which is devoid of any mention—none whatsoever—of this Action or this Settlement's supposed role in the resolution of the Securities Action. The district court's analysis of the proposed derivative settlement in *In re HQ Sustainable Maritime Industries, Inc., Derivative Litigation*, No. C11-0910RSL, 2013 WL 3191867, at *2 (W.D. Wash. June 20, 2013) is instructive. There, plaintiffs' counsel in the derivative action attempted to claim credit for the creation of a $2.75 million common fund that was used to fund the settlement in a related securities class action lawsuit. In evaluating whether to grant preliminary approval, the district court challenged plaintiffs' counsel's assertion that the proposed settlement provided a benefit to the corporation because "the pendency of the derivative claims put certain insurance funds in play that would not otherwise have been available to fund the global

---

[18] With their heads firm in the sand, the Settling Shareholders repeat their mantra that the Settlement "is the largest financial relief ever recovered for the benefit of a Pennsylvania corporation" (SH. Br. at 2), simply ignoring that discovery has revealed that the Settlement does <u>not</u> actually provide anywhere near $40 million in value.

[19] *See* Form 10-Q at 99.

settlement[.]" *Id.* In questioning this assertion, the district court adroitly observed that "[t]he parties in [the related securities action] represented that the $2.75 million settlement fund was the result of class counsels' efforts in the securities litigation, with no mention of the importance of the derivative actions or their counsel." *Id.* ("While the Court is willing to assume that defendants and their insurers insisted that the derivative actions be wrapped into a global settlement in order to afford defendants complete relief, there is no reason to assume that the settlement amount increased as a result of the pending derivative actions.").

Here, in attempting to justify the illusory nature of the Settlement, the SLC and the other Settling Parties, like the plaintiffs in *HQ Sustainable*, "vaguely suggest" that the Settlement somehow contributed to the resolution of the Securities Action but fail to "substantiate that hypothesis," including with any evidence that Exelon's insurers would not have contributed the $30 million to the Securities Action settlement but for the Settlement of this Action. *Id.* And just as in *HQ Sustainable*, the record in the Securities Action similarly reveals no mention of the purported role of this Settlement. In fact, Judge Kendall's final approval order omits any mention of this Action (and the Settlement), and nothing else in the Securities Action suggests that the Settling Parties had any role in creating the $173 million settlement fund. Instead, counsel in the Securities Action took exclusive credit for the creation of the $173 million settlement fund.[20]

Perhaps the best evidence that the $30 million provides no value to Exelon is the Settling Parties' vigorous efforts to conceal the arrangement from the Court and Exelon's public shareholders. The Settling Parties' new assertions that this arrangement played a role in resolving the Securities Action, and that the "$30 million net payment is [not] somehow less valuable"

---

[20] Securities Action, ECF No. 203 at 1 (***"The $173 million all-cash Settlement is the result of Lead Plaintiff's and Lead Counsel's diligent efforts*** in litigating this matter and the parties' arm's-length settlement negotiations with ..., the Honorable Layn R. Phillips (Ret.)[.]").

(Exelon Br. at 6) than an independent monetary payment, simply cannot be reconciled with their failure to disclose it <u>anywhere</u> in the prior Settlement briefing, as well as their efforts to keep it concealed long after Opposing Plaintiffs raised numerous concerns. Similarly, while the SLC's renewed Motion now touts the purported benefit conferred by this arrangement (*see* SLC Br. at 8), the specifics of the $30 million payment are not disclosed <u>anywhere</u> in the SLC Report—not even in the sections dedicated to the supposed benefits of the Settlement's monetary consideration—even though the SLC Report was prepared *after* the Settlement and the settlement in the Securities Action had already been reached.[21]

Finally, the fact that the $40 million—comprised of $30 million in already allocated insurance and up to $10 million in attorneys' fees—provides, at best, an illusory benefit was the principal reason that Opposing Plaintiffs rejected the Proposal, and now oppose the Settlement.

### 2. The Amount Offered in the Settlement Pales in Comparison to the Measurable Damages Incurred by Exelon

The illusory $40 million, even if credited at $40 million, stands in stark contrast to the hundreds of millions in measurable damages incurred by Exelon as a direct result of the bribery-related wrongdoing. At the time the Settlement was reached, Exelon had already incurred $238 million in fines in connection with the DPA and the Company's settlement with the ICC. Exelon has also paid at least $100 million in compensation to individuals involved in the bribery scheme, as well as untold millions in legal and defense costs. ECF No. 1, ¶¶15-19. Moreover, as discussed above, since the Settlement was reached, the damage sustained by Exelon from the bribery scandal has only *increased*, with the Company now forced to pay an additional $46.2 million fine to settle

---

[21] Also absent from the SLC Report is the fact that the █████████████████████████████████

charges brought by the SEC. Thus, to date, Exelon has incurred, at a bare minimum, a staggering **$384.2 million** in actual damage as a result of the bribery-related misconduct.

The Settling Parties offer no analysis of the Settlement's monetary component compared to the actual damages suffered by Exelon as a result of the misconduct. *Synfuel Techs.*, 463 F.3d at 654 (reversing settlement approval where "[i]n considering the fairness of the settlement, the court did not attempt to quantify the value of plaintiffs' case or even the overall value of the settlement offer"). While not surprising, their silence underscores that the Settlement does little to compensate Exelon for the harm caused by its fiduciaries, and should therefore be rejected.

*FirstEnergy* is instructive. In *FirstEnergy*, Judge Marbley evaluated the "fairness, reasonableness, and adequacy" of the monetary component of the proposed derivative settlement by analyzing the settlement amount—$180 million paid by FirstEnergy's insurers—with reference to "the harms resulting from the alleged bribery scandal." 2022 WL 14160253, at *3. In particular, Judge Marbley weighed the $180 million settlement amount against the hundreds of millions in "measurable direct costs" incurred by FirstEnergy as a result of the bribery scandal, such as a $230 million fine in connection with a deferred prosecution agreement and a $37.5 million ratepayer settlement, while also noting the likely existence of "other indeterminate damages[.]" *Id.* Such an analysis here only underscores the Settlement's inadequacy.

3.



[REDACTED]

---

22 While insurance is often the main source of recovery it is by no means the *only* potential source.  Here, several of Exelon's corporate fiduciaries were directly involved in the bribery scheme, while many others either had knowledge of the scheme, or recklessly permitted the conduct to occur.  Moreover, numerous third parties who directed or participated in the scheme were unjustly enriched at Exelon's expense. Nonetheless, these individuals have largely been allowed to retain the tens of millions in improper compensation received from Exelon.  As discussed *infra* §IV.B.5., defendant Crane alone received $60.1 million between 2020-2022, despite the fact that Exelon was operating in violation of the law while he was in charge.  Such funds can—and should—be used to fund a derivative settlement.















### 5. Defendant Crane's Compensation Reduction Demonstrates the Settlement Is Unreasonable

The Settling Parties attempt to defend the Settlement by pointing out that it purportedly required defendant Crane—who served as Exelon's CEO at the time ComEd entered into the DPA and was purportedly aware of the bribery scheme—to accept a $4.2 million reduction in his 2020-2022 performance compensation.  *See* IRC Br. at 6; SH Br. at 4; SLC Br. at 10.[30]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  *See Remijas v. Neiman Marcus Grp., LLC*, 341 F. Supp. 3d 823, 828-29 (N.D. Ill. 2018) (denying final approval after identifying concerns about the "illusory nature of the relief being afforded" where "[t]he settling parties attempt[ed] to argue" that certain "non-monetary benefits flow[ed] from the settlement" but "[t]hese non-monetary benefits, however, were issued prior to the class action settlement and thus cannot be fairly attributed to that settlement").

---

[30] In exchange for the $4.2 million reduction, Exelon's Board agreed not to pursue any other claims against defendant Crane or clawback any additional compensation.  Stip., Ex. A, Reforms at E.2.

### 6. The Clawback Arrangements Demonstrate the Settlement Is Unreasonable

In *FirstEnergy*, Judge Marbley considered that the settlement preserved FirstEnergy's ability to pursue "salary clawback claims" against the defendants named in the derivative action who were also implicated in the pay-to-play scheme, which he viewed as "a second major recovery source" beyond the $180 million cash payment provided in the settlement. *FirstEnergy*, 2022 WL 14160253, at *3-4. In granting approval, Judge Marbley was persuaded by the fact that the clawback claims against these defendants: (1) were "being pursued presently" by FirstEnergy at the time the settlement was reached; and (2) that the clawback claims that had been brought against one defendant "alone [were] worth approximately $56 million[,]" which meant there was "a fair probability that the $180 million [settlement amount] w[ould] be supplemented." *Id.*

The Settling Parties explicitly acknowledge the validity of Judge Marbley's analysis, asserting that the Settlement warrants approval, in part. █████████████████████████

██████████████████████████████████████     █████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

          ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



### C.    The Stage of Proceedings and Amount of Discovery Completed

This factor strongly supports denial of the Motion.  The Settlement was reached here after the SLC and defendants spent nearly two years insisting—successfully—that the *Clem* Action should remain stayed.  *See* ECF Nos. 25, 28, 31, 34, 38, 43, 60, 91.  In fact, the defendants in the *Clem* Action had not even filed a responsive pleading at the time the Settlement was announced.

Worse, there has been <u>zero</u> adversarial discovery into the underlying wrongdoing, or to test the strengths/weaknesses of the derivative claims that will be released if the Settlement is approved.[31]  *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 587 (N.D. Ill. 2011) ("This factor is relevant because it determines 'how fully the district court and counsel are able to evaluate

---

[31] The Settling Shareholders—in their haste to embrace the rejected Proposal terms and secure attorneys' fees—failed to secure any confirmatory discovery as part of the Settlement.

the merits of plaintiffs' claims.'").  Rather, the only discovery that has taken place to date is the very limited settlement-related discovery ordered by the Court.

The SLC tries to mask this fact by pointing to publicly available information like the SLC Report, the DPA, and the record from the "ComEd Four" criminal trial to claim, misleadingly, that "*all* parties have access to vast documentary and testimonial evidence[.]"  SLC Br. at 12-13.  But access to the anodyne SLC Report and certain public court documents is no stand-in for actual fact and expert discovery relating to the merits of the underlying derivative claims.

Further, it is clear from the Motion that the SLC would like the Court to simply embrace the SLC Report (and its investigation more broadly) as a substitute for the total lack of discovery and adversarial litigation that occurred prior to the Settlement.  The SLC repeatedly attempts to impress the Court with the sheer quantity of work that the SLC (or its advisors) purportedly did (*i.e.*, the review of millions of documents and the interviews of over 20 individuals).  But as the Court recognized at the August 31, 2023 hearing, the thoroughness of an investigation does not depend on the quantity of the work but rather on its *quality*:  "What if they looked at thousands and thousands of irrelevant documents, how would that show reasonable care?  The sheer number of documents means nothing."  Oddo Decl., Ex. D at 60:9-12.  And regarding the document review and the number of witnesses interviewed, the Court asked, "how do I tell that's reasonable care without knowing what the documents are or who the people were?"  *Id*. at 60:21-25.

Even if an SLC investigation is "in many respects, exhaustive and time-consuming[,]" it is still not reasonable when "significant errors or shortcomings exist in the SLC's report[,]" including omitting discussion, analysis, or consideration of key facts or claims.  *Sutherland v. Sutherland*, 958 A.2d 235, 242 (Del. Ch. 2008).  Indeed, the omissions here are glaring.  While the report indicates that the SLC interviewed "over twenty witnesses"(SLC Report at 46), it does not identify who those witnesses were nor how they were chosen, noting only that they included "current and

former employees." The SLC does not disclose whether Pramaggiore, Marquez, or Hooker were among these employees that were interviewed, even though they are at the center of the bribery scandal. The SLC also readily admits that it "did not interview all of the current and former members of the Boards but focused on those who served on relevant Committees…." *Id*. at 46 n.37. The SLC also does not appear to have interviewed any of the third parties, such as consultants or McClain or Madigan, the ringleaders of the bribery conspiracy.[32]

The SLC also misapprehended the law by insisting that directors and officers' actions are protected by the business judgment rule, even though the SLC Report itself states that the latter covers "mistakes of judgment" that "are honest and ... are fairly within the scope of the powers and discretion confided to the managing body[.]" SLC Report at 77. Similarly, the SLC believed there was no breach of the duty of loyalty. *Id*. at 78. But here, ComEd's admissions in the DPA and the criminal conviction of three officers for bribery proves that the fiduciaries were disloyal and dishonest, and thus could <u>not</u> benefit from the business judgment rule. "The erroneous use by the committee of a court's limited standard of review rather than the careful, diligent and meticulous standard required of a committee scrutinizing a possible breach of fiduciary duty vitiates the usefulness of the committee's findings as a defense to this action." *Davidowitz v. Edelman*, 153 Misc.2d 854, 858 (N.Y. Sup. Ct. 1992).

Perhaps recognizing the deficiencies in the SLC Report itself, as well as the concerns expressed by the Court at the August hearing, the SLC has submitted Exhibit E to its renewed

---

[32] Courts have held that failure to interview key witnesses demonstrates that an SLC did not exercise reasonable care in its investigation. *See, e.g.*, *Barovic v. Ballmer*, 72 F. Supp. 3d 1210, 1215-16 (W.D. Wash. 2014) ("The [demand review committee's] failure to even attempt to speak with any individual who participated in the [regulatory] investigation [regarding the underlying misconduct] does raise questions about the diligence with which the [committee] pursued its investigation."); *see also Hasan v. CleveTrust Realty Invs.*, 729 F.2d 372, 379 (6th Cir. 1984) (holding "that the corporation failed to demonstrate the procedural adequacy of [the SLC's] investigation" because the SLC "failed to interview representatives from" the companies involved in the transaction at issue).

Motion in an effort to augment the record after the fact. Exhibit E, however, raises more questions than it answers. For instance, Exhibit E, like the SLC Report, cites the review of transcripts from the criminal trial of the "ComEd Four," all of which occurred well after the SLC had already negotiated its settlement with the IRC (which it brazenly did before issuing the SLC Report) and much of which took place after the Proposal (which encompassed the same terms as the Settlement) was rejected by Opposing Plaintiffs.[33]

### D. Complexity, Length, and Expense of Further Litigation

Predictably, the Settling Parties contend that, if the Settlement is rejected, continued litigation will be complex and expensive and erode available insurance. Exelon Br. at 10-12. Yet, their explanation on this front is flawed. The fact that Exelon has <u>admitted</u> to a host of wrongdoing in connection with the DPA and recent SEC charges will streamline issues, including liability. Moreover, the Settling Parties' repeated reliance on the facts developed in the Securities Action and criminal proceedings—to excuse the lack of formal discovery that has occurred here—shows litigating this case will be far less expensive and complex. ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

---

[33] Further, the SLC Report and Exhibit E do not delineate what the SLC itself reviewed as opposed to what its counsel reviewed, which in and of itself calls into question the reasonableness of the investigation. *See, e.g.*, *Besthoff on behalf of World Water Works Holdings, Inc. v. Mitta*, No. CV171449JMVMF, 2018 WL 3425733, at *9 (D.N.J. July 16, 2018) ("while [an SLC member] may reasonably rely on independent counsel, outside counsel cannot usurp the ultimate role of the [SLC member]").

### E. The Amount of Opposition to the Settlement

Here, the Settlement is opposed by Opposing Plaintiffs who not only led the settlement negotiations—prior to being improperly excluded—but who also constituted a majority of the plaintiffs' group at the time the Proposal, which now forms the basis of the Settlement, was rejected. Moreover, Opposing Plaintiffs have spent the past several months working to expose the illusory nature of the Settlement's purported benefits and the Settling Parties' conduct in agreeing to same. They are also the only parties to receive and review the limited settlement-related discovery ordered by the Court, which has only strengthened the view that the Settlement is not fair, reasonable, and adequate. As such, this factor also weighs against approval of the Settlement.

### F. The Opinion of Competent Counsel

The Court is entitled to rely on the opinion of competent counsel in evaluating a proposed settlement. *See NCAA*, 314 F.R.D. at 588. Based on the facts and evidence set forth *supra* §IV.A., there is ample reason to question the conduct and motives of the Settling Parties' and their counsel. Thus, the Court should look to the well-substantiated opinion of counsel to Opposing Plaintiffs regarding the Settlement, which weighs heavily against approval.

## V. OPPOSING PLAINTIFFS MAINTAIN STANDING WHILE THE SETTLING SHAREHOLDERS LACK STANDING

In Pennsylvania, all stockholders are required to make a litigation demand on a company's board of directors and may only file a derivative lawsuit <u>after</u> the litigation demand has been wrongfully refused. 15 Pa.C.S.A. §1781; *see also Cuker v. Mikalauskas*, 547 Pa. 600, 611 (1997). While each of the actions filed by Opposing Plaintiffs allege that their demands were wrongfully refused, the duplicative *Dybas* Action filed by the Settling Shareholders does not appear to contain such allegations. This failure is not surprising since the Settling Shareholders filed the *Dybas* Action *before* receiving the SLC's Determination Letter that rejected the demands of all shareholders (including the Settling Shareholders) (Oddo Decl., Ex. B), and *after* they had already

agreed to settle their claims, which together make it impossible for them to assert that Exelon's Board wrongfully refused their demands. Thus, they have no basis to maintain the *Dybas* Action.[34]

Despite lacking derivative standing under Pennsylvania law, the Settling Shareholders claim that Opposing Plaintiffs lack standing based on a hyper-technical reading of the standing criteria ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Settling Stockholders merely quibble with the form of the evidence submitted and insist, without providing any supporting authority, that proof of stock ownership can only be in the form of account statements. 15 Pa.C.S.A. §1782 ("Section 1782"), however, states only that a plaintiff must aver and it must be made to appear that each plaintiff "was a shareholder of the corporation or owner of a beneficial interest in the shares at the time of the transaction of which the plaintiff complains[.]" Similarly, Rule 1506(a)(1) of the Pennsylvania Rules of Civil Procedure states that "the complaint shall set forth ... that each plaintiff is a stockholder or owner of an interest in the corporation or other entity." Thus, the relevant Pennsylvania statutes do not require shareholders who bring a derivative suit to present documentary proof of stock ownership.[35]

---

[34] It follows that the Settling Shareholders are not adequate representatives as "[a]n adequate representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class." *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990).

[35] ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Finally, even if Opposing Plaintiffs as a group somehow were found to not meet the technical requirements of standing (they plainly do), Section 1782(b) permits them to maintain their actions "on preliminary showing to the court ... that there is a strong prima facie case in favor of the claim asserted on behalf of the corporation and that without the action serious injustice will result." Here, the strength of the prima facie case in part can be shown through the Company's own admissions in the DPA of its fiduciaries' wrongdoing, and in how various Individual Defendants have been found guilty of bribery. And because Opposing Plaintiffs are the only parties seeking to maintain the derivative claims—the Settling Shareholders seek to dismiss them via the Settlement—they are the only parties in the Action to assert the claims on Exelon's behalf.

## VI.    THE PROPOSED NOTICE IS DEFICIENT UNDER RULE 23.1

While Opposing Plaintiffs strongly believe that the Motion should be denied, if the Court is inclined to grant the Motion, either in whole or in part, the proposed Notice (SLC Br., Ex. G) should be revised, at a minimum, to apprise Exelon's public shareholders that:

- a majority of the plaintiffs who sent litigation demands, commenced litigation, and participated in settlement negotiations (*i.e.*, Opposing Plaintiffs) rejected as inadequate the exact same terms reflected in the proposed Settlement and opposed Preliminary Approval;

- limited discovery ordered by the Court and taken by Opposing Plaintiffs demonstrates that $30 million of the $40 million provided by the Settlement has already been used to fund the Securities Action settlement;

- the limited discovery demonstrates ███████████████████████████
  ████████████████████████████████████████████ ; and

- the limited discovery demonstrates ██████████████████████████
  ████████████████████████████████████████████

It is axiomatic that these uncontested facts are material to Exelon shareholders tasked with evaluating the proposed Settlement's terms and deciding whether to support or object to the Settlement. *See Maher v. Zapata Corp.*, 714 F.2d 436, 451 (5th Cir. 1983) (recognizing that Rule 23.1 requires that the notice provided to shareholders contain "sufficient information for them to make a 'rational decision whether they should intervene in the settlement approval procedure'"); *In re Wendy's Co. S'holder Derivative Action*, No. 1:16-CV-1153, 2020 WL 13169460, at *12 (S.D. Ohio Jan. 24, 2020) (noting that notice should provide shareholders "with enough information to permit them to make a rational decision about whether to intervene in the settlement-approval process"). Without such information, the Notice creates an "incomplete and misleading" picture of the Settlement's terms and actions taken (and not taken) by the Settling Parties in negotiating the Settlement and seeking court approval. *See Eubank*, 753 F.3d at 728.[36]

## VII. CONCLUSION

For the foregoing reasons, Opposing Plaintiffs respectfully submit that the Settlement is not fair, reasonable, and adequate, and request that the Court deny the Motion with prejudice.

Dated: November 29, 2023

*/s/ Stephen J. Oddo*
STEPHEN J. ODDO

ROBBINS LLP
BRIAN J. ROBBINS
ERIC M. CARRINO

---

[36] In *Eubank*, the Seventh Circuit reversed an order approving a settlement where the notice "was incomplete and misleading" and "failed to mention that four of the five original class representatives had opposed the settlement and been promptly replaced by other persons, selected by class counsel." *Id*. The Settling Shareholders attempt to distinguish *Eubank* by pointing out that it was a class action and not a derivative action (*see* SH Br. at 6 n.2), but the notice provisions set forth in Rule 23.1 and Rule 23 are similar in terms of requirements and both implicate the same due process concerns.

5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
      soddo@robbinsllp.com
      ecarrino@robbinsllp.com

POWER ROGERS, LLP
DOMINIC C. LOVERDE
70 W. Madison Street, 55th Floor
Chicago, IL 60602
Telephone: (312) 827-6113
Facsimile: (312) 236-0920
Illinois Bar No. 6324263
E-mail: dloverde@powerrogers.com

*Attorneys for Plaintiff James Clem*

SCOTT+SCOTT ATTORNEYS AT LAW LLP
DONALD A. BROGGI
JING-LI YU
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
E-mail: dbroggi@scott-scott.com
jyu@scott-scott.com

GEOFFREY M. JOHNSON
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (860) 537-4432
E-mail: gjohnson@scott-scott.com

JOSEPH A. PETTIGREW
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
E-mail: jpettigrew@scott-scott.com

*Attorneys for Plaintiff Donna M. Nicosia and
Plaintiff City of Coral Springs Police Officers'
Pension Plan*

KLAUSNER, KAUFMAN, JENSEN &
LEVINSON
ROBERT D. KLAUSNER
BONNI S. JENSEN
7080 NW 4th Street
Plantation, FL 33317

Telephone: (954) 916-1202
Facsimile: (954) 916-1232
E-mail: bob@robertdklausner.com
bonni@robertdklausner.com

*Attorneys for Plaintiff City of Coral Springs*
*Police Officers' Pension Plan*

THE LAW OFFICES OF MICHAEL M.
MULDER
MICHAEL M. MULDER
ELENA N. LIVERIS
1603 Orrington Ave., Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
Facsimile: (312) 263-2942
E-mail: mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

*Local Attorneys for Plaintiff Donna M. Nicosia*
*and Plaintiff City of Coral Springs Police*
*Officers' Pension Plan*

BRAGAR EAGEL & SQUIRE, P.C.
LAWRENCE EAGEL
BRANDON WALKER
810 Seventh Ave., Suite 620
New York, NY 10019
Telephone: (212) 308-5888
E-mail: eagel@bespc.com
walker@bespc.com

CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
DANIEL O. HERRERA
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4480
E-mail: dherrera@caffertyclobes.com

*Attorneys for Plaintiff Melvin Peller*

MILLER LAW LLC
MARVIN A. MILLER
145 S. Wells St., Suite 1800
Chicago, Illinois 60606
Telephone: (312) 332-3400
E-mail: mmiller@millerlawllc.com

JOSHUA M. LIFSHITZ
LIFSHITZ LAW PLLC
1190 Broadway
Hewlett, NY 11557
Telephone: (312) 332-3400

*Attorneys for Plaintiff Pinchas E. Raul*

1642507

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing Memorandum of Law in Support of Opposing Plaintiffs' Omnibus Opposition to Renewed Motion for Preliminary Approval of Derivative Settlement will be served upon all counsel of record in this action via the U.S. District Court CM/ECF System on this 29th day of November 2023.

*/s/ Stephen J. Oddo*
STEPHEN J. ODDO