**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE EXELON CORPORATION DERIVATIVE LITIGATION | **REDACTED VERSION**<br><br>**UNREDACTED VERSION FILED UNDER SEAL**<br><br>Case No. 1:21-cv-03611<br><br>Hon. John Robert Blakey |

# SETTLING SHAREHOLDERS' REPLY BRIEF IN SUPPORT OF THE SLC'S RENEWED MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT

Settling Shareholders,[1] by and through their undersigned counsel, respectfully submit this reply brief in response to Opposing Shareholders' omnibus opposition brief (Dkt. 167, "Opp."), and in support of the SLC's Preliminary Approval Motion.

I. INTRODUCTION

The proposed Settlement is an extraordinary result for Exelon and its shareholders, conferring unprecedented financial relief upon the Company in the form of a $40 million cash payment and the forfeiture of over $4.2 million in compensation by an individual defendant, as well as a series of comprehensive governance reforms tailored to prevent similar misconduct that gave rise to this Action from ever occurring again at Exelon.[2] Indeed, this is ***the first derivative Settlement to ever include a cash payment to a Pennsylvania corporation***, let alone one of this magnitude. Unable to attack this outstanding and historic achievement on the merits, Opposing

---

[1] Capitalized terms not defined herein have the same meaning as in Settling Shareholders' brief in support of the SLC's Preliminary Approval Motion, filed under seal on October 26, 2023. Dkt. 146, Ex. A. Additionally, unless otherwise specified, all emphasis herein is supplied and all internal citations and quotation marks are omitted.

[2] Opposing Shareholders have never called into question the value conferred upon Exelon and its shareholders by the Settlement's corporate governance reforms. Nor could they. The reforms included as part of the Settlement are truly transformative, establishing a robust compliance regime at Exelon concerning lobbying, political activities, and interactions with public officials that will prevent similar misconduct from occurring in the future, as well as the addition of three new independent Board members with expertise in areas like corporate ethics, management integrity, and compliance issues, while two longtime directors will retire. These reforms will benefit Exelon and its shareholders for years to come and are of the type that by themselves can support a fair, reasonable, and adequate derivative settlement. *See, e.g.*, Corporate Governance Terms, *In re Abbott-Depakote S'holder Derivative Litig.*, No. 1:11-cv-08114 (N.D. Ill. Mar. 6, 2014), Dkt. 306-3 (setting forth terms of governance-only settlement providing for new regulatory compliance standards, including a clawback policy); Final Order and Judgment, *In re Abbott-Depakote S'holder Derivative Litig.*, No. 1:11-cv-08114 (N.D. Ill. May 22, 2014), Dkt. 332 (approving thereof). As to the reforms, Opposing Shareholders relegated themselves to the "role of bystanders" (Opp. at 8) in contrast to Settling Shareholders, as no Opposing Shareholders issued their own settlement demand outlining proposed governance reforms. *See* Declaration of Melinda A. Nicholson in Support of Settling Shareholders' Reply Brief in Support of the SLC's Renewed Motion for Preliminary Approval of Derivative Settlement ("Nicholson Decl.") ¶2, filed contemporaneously herewith.

Shareholders resort to subterfuge, overtly mischaracterizing and misstating every aspect of the Settlement—including, *inter alia*, the availability of insurance, negotiations, governing law, and even the consideration itself—to concoct a vast conspiracy among Setting Shareholders, an independent SLC, an independent IRC, the Board, the individual defendants, a renowned Mediator, and no less than seven well-respected law firms acting as counsel for these parties. Once the Court parses through Opposing Shareholders' makeweight allegations, however, what remains is an exemplary Settlement which easily meets the low threshold for preliminary approval sought in the Preliminary Approval Motion, and ultimately merits final approval. The Court should reject any calls to further delay final consideration of the Settlement and order dissemination of the proposed form of Notice submitted by the Settling Parties.

## II. ARGUMENT

### A. The $40 Million Cash Payment Is Not "Illusory" and the Board's Business Judgment Regarding Exelon's Use of Those Funds Is Proper and Customary

The Settlement includes the largest financial relief ***ever*** recovered for the benefit of a Pennsylvania corporation in derivative litigation. That excellent result notwithstanding, Opposing Shareholders now attempt to discredit the unprecedented $40 million cash payment to Exelon by claiming it is somehow "illusory" and "constitutes nothing more than a double-counting of insurance proceeds." Opp. at 22-26. Opposing Shareholders' position is based on the Company's recent confirmation that *after* the Settling Parties agreed to settle this Action, Exelon's Board decided, like the boards of many other corporations that have received cash payments from directors' and officers' insurers in connection with derivative settlements, to direct the net portion of the cash component of the Settlement ($30 million) towards the resolution of the parallel securities action styled *Flynn v. Exelon Corp.*, No. 1:19-cv-8209 (N.D. Ill.) ("Securities Action").

2

There is nothing improper or unusual about this business decision, however, and there is no merit to—nor is there any legal support for—Opposing Shareholders' argument.[3]

At the time the Settlement terms were agreed to, there were no restrictions on how Exelon could or would use the $40 million cash payment to be received as part of the Settlement. This is explicit in ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and formal Stipulation (Dkt. 72-1, "Stip.") executed by the Settling Parties.

---

[3] Opposing Shareholders complain that the Settlement's cash component, "even if credited at $40 million" (as it should be), is inadequate. Opp. at 26. But derivative settlements typically include no financial relief at all. *See In re Synchronoss Techs., Inc. S'holder Derivative Demand Refused Litig.*, 2021 U.S. Dist. LEXIS 238014, at *13 (D.N.J. Dec. 13, 2021) (the "overwhelming majority of [derivative] settlements result solely in corporate governance changes"). A recent study evidences that **76% of "parallel" derivative settlements from 2019-2021 included no monetary component**, and of the 24% which did, the median settlement was **under $7.2 million**. Laarni T. Bulan, *Parallel Derivative Action Settlement Outcomes* (National Law Review, Sept. 9. 2022) (Nicholson Decl. Ex. 1). The proposed Settlement here not only compares very favorably to other derivative settlements; it far exceeds the median value of securities class action settlements (which necessarily settle for a cash component paid directly to class members), which was $13 million for 2022. *See* Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements – 2022 Review and Analysis*, at 4 (Cornerstone Research 2022) (Nicholson Decl. Ex. 2) (showing distribution of securities class action settlements from 2013-2022). Courts have recognized the significance of securing such substantial cash benefits in derivative settlements. *See, e.g.*, *In re Atmel Corp. Derivative Litig.*, 2010 U.S. Dist. LEXIS 145551, at *40-41 (N.D. Cal. Mar. 31, 2010) (approving derivative settlement providing for $9.65 million cash payment which "exceeds the average recovery in shareholder derivative litigation"). The $40 million cash payment also compares favorably to other derivative settlements as a percentage of estimated recoverable damages after trial. Opposing Shareholders' claim that Exelon incurred $384.2 million in actual damages is dubious at best, as that figure includes "at least $100 million in compensation to individuals involved in the bribery scheme" (Opp. at 26, 27), ignoring that those individuals performed at least some legitimate work, and that the Settlement preserves Exelon's right to pursue clawback actions against, and has withheld compensation from, certain wrongdoers. Even assuming, *arguendo*, the full $384.2 million in damages, the $40 million cash payment represents more than 10.4% of that amount, which is well within the range of approval for courts that have considered this a relevant metric. *See Appel v. Berkman*, No. 12844-VCF, Tr. at 45-46 (Del. Ch. Feb. 20, 2020) (Nicholson Decl. Ex. 3) (approving settlement equating to approximately 5% of potential damages); *Aldridge v. Blackmore*, No. 12196-CB (Del. Ch. Oct. 10, 2017) (Nicholson Decl. Ex. 4) (approving settlement equating to approximately 8.6% of maximum damages); *In re Jefferies Grp., Inc. S'holders Litig.*, 2015 Del. Ch. LEXIS 158, at *9 (Del. Ch. June 5, 2015) (approving settlement equating to "less than 11% of the damages sought").

3

*See* Stip. §VII, ¶3.1. Like any monies earned or received by Exelon in connection with its normal business (or litigation) activities, the Company was able to utilize the cash payment in any rational manner that the Board saw fit, in an exercise of its independent business judgment.[4] And the Settlement was not contingent on resolution of the Securities Action—Exelon would receive the $40 million regardless of what transpired in that case. The Board's decision to direct the net cash to be received by Exelon via the Settlement towards the resolution of the Securities Action ***after*** the Settling Parties agreed to settlement terms resolving this Action: (a) has no bearing on the evaluation of the adequacy of the Settlement terms recommended by Judge Phillips and agreed to by the Settling Parties ***before*** the parties to the Securities Action had even reached an agreement to resolve that matter; and (b) is a common and reasonable business decision by a board of directors where a corporation is the subject of parallel securities and derivative litigation and the derivative claims are resolved with a cash payment to the corporation from directors' and officers' insurance.[5]

---

[4] Under Pennsylvania law and virtually all other jurisdictions, the business judgment rule is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *Braun v. Herbert*, 180 A.3d 482, 485 (Pa. Super. Ct. 2018). Such a decision should not be disturbed if it can be attributed to any rational business purpose. *Niki Dev. Corp. v. Hob Hotel Chi. Partners, L.P.*, 2003 U.S. Dist. LEXIS 4949, at *43 (N.D. Ill. Mar. 28, 2003).

[5] Opposing Shareholders' counsel, as experienced practitioners in the derivative/securities arena, are well-aware of this customary board decision. Indeed, in seeking approval of the recent *Twitter* derivative settlement, counsel for Opposing Shareholder Clem, Robbins LLP, argued that derivative actions are independent from related securities class actions and can appropriately be resolved first for unencumbered monetary settlements. *See* Dkt. 126, Ex. 1 at 2-11 (settlement approval brief arguing that "Twitter will receive $38 million from the Individual Defendants' insurers…. [T]here are no limitations on how the Cash Payment may be used….Twitter may use the $38 million—like any other corporate asset—to satisfy any judgment….Plaintiffs are unaware of any Delaware Court of Chancery or Supreme Court decision supporting the proposition that settlement of a derivative action prior to resolution of a securities litigation is disfavored. Although the satisfaction of both the derivative claims and the securities claims may come from the same director and officer insurance policies, the claims are different and may be resolved independently"). Robbins LLP served as plaintiffs' counsel in a related derivative action (Dkt. 126, Ex. 2 at 4, 25, 51) and the settlement papers were filed on its behalf. Dkt. 126, Ex. 3 at 1 n.2.

Indeed, courts routinely approve derivative settlements with financial recoveries that are explicitly allocated to fund a parallel securities settlement. For example, in *Kent v. Stoelting*, No. 17-cv-893 (E.D. Wis.), a $6.9 million derivative settlement was approved, with $4.8 million partially funding a parallel securities settlement. *See* Kent Dkt. 62 §III (Nicholson Decl. Ex. 5).[6] This Court in *Cook v. McCullough*, No. 11-cv-9119 (N.D. Ill.) similarly approved a $20 million derivative settlement which provided "that $10 million from the Settlement Amount will be used to fund any settlement or resolution of the Federal Securities Class Action." *See Cook* Dkt. 75-2 ¶2.2 (Nicholson Decl. Ex. 8). Other cases are in accord. *See, e.g.*, *Scott v. Wei*, 2021 U.S. Dist. LEXIS 90861, at *9-10 (S.D.N.Y. May 12, 2021) (approving $240,000 derivative recovery that helped resolve related class action "without depleting the company's existing resources"); *Lihua Int'l Inc. S'holder Derivative Action*, No. 14-cv-3543, Dkt. 129-1 ¶B.2 (S.D.N.Y.) (Nicholson Decl. Ex. 9) (approval of derivative recovery of $1.2 million, partially funding securities settlement, holding "the Company does not have to exhaust its own funds [and] the Company's shareholders will directly benefit by [its] receipt"); *In re SandRidge Energy Inc. S'holder Derivative Litig.*, No. 5:13-cv-102, Dkt. 301 at 7 (W.D. Okla. Oct. 9, 2015) (Nicholson Decl. Ex. 10) (approving $38 million recovery partially paid "Designated Litigation Expenses," including possible settlement, of securities action).

Tellingly, Opposing Shareholders' brief is devoid of caselaw standing for the proposition that the Board's unremarkable exercise of business judgment is somehow improper and that the $40 million cash payment is "illusory," **because no such authority exists** (for good reason). Opposing Shareholders rely on just one case in support of their position—*In re HQ Sustainable*

---

[6] In *Kent*, as here, the settlement was obtained with the assistance of Judge Phillips as mediator (Tr. at 10:18-21, Nicholson Decl. Ex. 6), and the settling plaintiffs were represented by Robbins LLP (then known as Robbins Arroyo LLP). *Kent* Dkt. 64 at 18 (Nicholson Decl. Ex. 7).

*Mar. Indus., Inc.*, 2013 U.S. Dist. LEXIS 87103 (W.D. Wash. June 20, 2013) ("*HQ I*"). Opp. at 24-25. But Opposing Shareholders' "authority" *supports* preliminary (and subsequently, final) approval of this Settlement. In discussing *HQ I*, which they submit is "instructive" (*id.*), Opposing Shareholders fail to disclose that the questions raised in *HQ I* by the Western District of Washington *exclusively* concerned whether the proposed attorneys' fee award for derivative plaintiffs' counsel should be approved—***not whether the proposed derivative settlement should be approved***—and that their citation to *HQ I* is to the *HQ* Court's "Order Preliminarily Approving Derivative Settlement." *HQ I*, 2013 U.S. Dist. LEXIS 87103, at *2, *5-10. Opposing Shareholders also omit that the proposed settlement and attorneys' fee award ***were finally approved in all respects*** three months after entry of the *HQ I* preliminary approval order, with the *HQ* Court concluding that the settlement was "***fair, reasonable, and adequate***" and "the Fee Award is fair and reasonable." *In re HQ Sustainable Mar. Indus., Inc.*, 2013 U.S. Dist. LEXIS 140242, at *3-11 (W.D. Wash. Sept. 26, 2013) ("*HQ II*"). To be clear, Opposing Shareholders' only cited authority supports this Court granting preliminary (and ultimately final) Settlement approval.

Opposing Shareholders also attack the $40 million cash payment as "illusory" because the Securities Action settlement has already received Court approval, while the proposed Settlement of this Action has yet to receive such approval, and as a result Exelon already received $30 million which was used to fund part of the Securities Action settlement. Opp. at 24. This is a distinction without a difference. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Moreover, as demonstrated by Opposing Shareholders' *own authority*, the *HQ* derivative settlement was preliminarily approved on June 20, 2013 (and finally approved on September 26, 2013), *after* the parallel securities class action settlement was finally approved on March 21, 2013. *HQ I*, 2013 U.S. Dist. LEXIS 87103, at *3. In fact, the *HQ* derivative plaintiffs did not even move for preliminary settlement approval until May 7, 2013, well after the securities class action settlement was finally approved. *Id.* at *3-4. The record here plainly shows the Settlement terms were agreed to by the Settling Parties *before* the Securities Action parties agreed to resolve that case. The order of Court approval is of no import.

### B. The Settling Parties Engaged in No "Highly Questionable" Conduct

The Settlement was the result of a transparent, years-long process. Opposing Shareholders claim to have "expose[d]" the "troubling circumstances" of the negotiations (Opp. at 17), but the inescapable fact is that Opposing Shareholders and their counsel were privy to, and themselves participated in, ***all settlement negotiations up to and including the moment Judge Phillips issued his March 29, 2023 Mediator's proposal, which they chose to reject***. At bottom, Opposing Shareholders simply disagree with Setting Shareholders' decision to accept the terms the Mediator recommended and enter into the Settlement. Their allegations of improper conduct are baseless. There is not a scintilla of evidence to suggest that any Settling Party engaged in any "questionable" conduct. To the contrary, Judge Phillips' sworn declaration "assure[s] the Court that during all of the negotiations [he] participated in with the Settling Parties, there was nothing collusive about the negotiations or the mediation process, and the negotiations were conducted at arm's length and in good faith." Dkt. 144-4 ¶2; *see also id.* ¶19 ("All negotiations throughout the mediation process took place on a hardfought, fully arm's length basis."). Simply put, Opposing Shareholders' suggestion that the Settlement is the product of "collusion" is absurd.

All demand shareholders were afforded the opportunity to fully and equally participate in negotiations overseen by the experienced, well-respected neutral Mediator, a fact Opposing Shareholders concede typically weighs "in favor of approval." Opp. at 20. The March 29, 2023 Mediator's proposal, issued over three weeks before the Mediator made a proposal to resolve the related Securities Action, called for all demand shareholders to report by April 5, 2023 whether there was unanimous agreement to accept the proposal. Dkt. 144-4 ¶¶20-23. Because certain Opposing Shareholders did not agree, Judge Phillips was informed on April 5, 2023 that there was not universal agreement. *Id.* ¶¶24-25. Shortly thereafter, Settling Shareholders communicated their willingness to accept the terms proposed by the Mediator, subject to certain additional corporate governance reforms which were subsequently added to the Settlement. *Id.* ¶25.

[redacted]



After a Pennsylvania SLC recommends settlement, as the SLC did here, 15 Pa. C.S.A. § 1781(a)(3) states that "a plaintiff may maintain a derivative action to enforce a right of a business corporation" if "the action is maintained for the limited purpose of seeking court review under section 1783(f) [a SLC settlement accepted by a board]." This Action was filed for that purpose, in accordance with Pennsylvania law.[8]

---

[7] Opposing Shareholders criticize Settling Shareholders' complaint for failing to allege wrongful demand refusal (Opp. at 42-43), but the SLC recommended settlement and has not rejected the demands.

[8] Even without a specific statute authorizing such process, as a practical matter, shareholders commonly file a derivative complaint and settlement agreement contemporaneously for the purpose of obtaining court approval of the settlement, especially following a lengthy demand review and/or special committee process, as here. Indeed, there are numerous cases in which **Opposing Shareholders' counsel took those exact steps**, engaging in pre-suit mediation and filing a complaint only *after* having negotiated settlement terms for purposes of effectuating settlement. *See, e.g.*, *City of Monroe Emps.' Ret. Sys. v. Murdoch*, C.A. No. 2017-0833-AGB (Del. Ch. Feb. 9, 2018) (Nicholson Decl. Ex. 11) (Robbins LLP (then Robbins Arroyo LLP)); *Meyer v. Soon-*

The record here bears no resemblance to the cases cited by Opposing Shareholders. Here, all shareholders were equally situated when the Mediator's proposal was issued, and each had the opportunity to participate fully and equally in the negotiations. Thus, this Action is distinguishable from *Reynolds v. Beneficial Nat'l Bank*, where the plaintiffs filed an initial complaint in order to effectuate a settlement which sought to release a far more developed, related case set for trial. 288 F.3d 277, 281 (7th Cir. 2002). Opposing Shareholders' other citations are similarly inapposite. *See, e.g.*, *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) (allegations of "discrimination against a subset of the Class" not present here); *Liebman v. J.W. Petersen Coal & Oil Co.*, 73 F.R.D. 531, 534 (N.D. Ill. 1973) ("Counsel for plaintiffs in four of the six actions objected to the settlement proposal, arguing that they had not participated in the negotiations …."). Moreover, in *Liebman,* the likelihood of prevailing both on liability and damages was high, whereas here, by contrast, Opposing Shareholders have never articulated a realistic path to secure a greater recovery for Exelon's benefit than what the historic Settlement provides.[9]

Fundamentally, Opposing Shareholders disagree with Settling Shareholders' decision to accept Judge Phillips' proposal and enter into the Settlement. And it is their right to disagree. But Opposing Shareholders' disagreement does not render this outstanding Settlement inadequate, and their allegations of collusion or an unfair process are patently false and should be rejected outright.

**C.** ██████████████████████████████

██████████████████████████████████████

██████████████████████████████

---

*Shiong*, No. 37-2019-00019103-CU-SL-CTL (Cal. Super. Ct.) (Nicholson Decl. Ex. 12) (Lifshitz Law PLLC (then Lifshitz & Miller LLP)); *Kloss v. Kerker*, No.: 502010CA018594XXXXMB (Fl. Circuit Ct., 15th Jud. Cir., Palm Beach Cnty.) (Nicholson Decl. Ex. 13) (Robbins LLP).

[9] Opposing Shareholders do not cite a single case where a shareholder has succeeded in overturning the determination of a Pennsylvania SLC under Section 1783, because ***none exists***.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓ Opposing Shareholders' only rejoinder is to argue that their standing deficiencies result from "a hyper-technical reading of the standing criteria." Opp. at 42-44. But there is a vast gulf between what the law regarding derivative standing is, on the one hand, and what Opposing Shareholders wish the law was, on the other. The "contemporaneous ownership rule" that Opposing Shareholders try to downplay as "hyper-technical" is black-letter law: a plaintiff may not commence or maintain a derivative suit for the benefit of a corporation (or resolve such claims) unless the plaintiff ***has continuously held stock in the corporation since the time of the alleged wrongdoing***. *Smith v. Stevens*, 957 F. Supp. 2d 466, 469 (S.D.N.Y. 2013); *In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1202 (N.D. Cal. 2007). Rule 23.1 requires a derivative plaintiff to "demonstrate possession of an ownership interest in the company it seeks to represent that is contemporaneous with the conduct for which it seeks recovery." *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 157 (2d Cir. 2015); *see also In re Gen. Instrument Corp. Sec. Litig.*, 23 F. Supp. 2d 867, 872 (N.D. Ill. 1998) ("Rule 23.1 requires an ownership interest at the time of the transaction of which the plaintiff complains."). Any putative derivative plaintiff "who has not satisfied" the contemporaneous ownership rule, but asserts claims based on alleged misconduct that pre-dates the shareholder's acquisition of shares, "***is no proper party***, whatever the merits of the underlying claims." *Facebook*, 797 F.3d at 157.

[redacted][10][redacted]

[redacted]

### D. The Proposed Form of Notice Satisfies Rule 23.1 and Due Process

The proposed form of Notice fully complies with Rule 23.1 and due process and should be approved. Opposing Shareholders urge the Court to deviate from well-established notice standards for derivative settlements, seeking disclosure of their "rejection" of the Settlement as well as a host

---

[10] [redacted]

of cherry-picked, so-called "uncontested facts," many of which are gross mischaracterizations. Inclusion of such information would skew what should be a "neutral" factual recitation regarding the Settlement. It would also require the Settling Parties to insert clarifying information to prevent the Notice from misleading Exelon shareholders, and risks creating significant confusion.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ This would likely include nuanced legal arguments that may confuse a typical Exelon shareholder—the very sort of language Courts have stated should be avoided in public notices. Opposing Shareholders tellingly fail to cite any case where information of the sort they request, ████████

████████████████████████████ has ever been included in a settlement notice. ████████

███████████████████████████████████████████████████████

Indeed, objectors to the *Boggess* derivative settlement raised similar arguments, which were rejected in their entirety, including the claim that "the notices are deficient in that they did not reveal that several named plaintiffs objected to the settlement." *Boggess v. Hogan*, 410 F. Supp. 433, 442 (N.D. Ill. 1975). As this Court correctly pointed out, "[i]t is a generally accepted principle that due process requires that the notice of a settlement proposal must reasonably apprise members of the class of the terms of the settlement and of the options open to those who would dissent." *Id*. at 442. The Notice complies with this edict. Notably, two cases cited by Opposing Shareholders involved substantially similar notices as the Notice here, which were approved without issue. *See Maher v. Zapata Corp.*, 714 F.2d 436, 451 (5th Cir. 1983); *see also In re Wendy's Co. S'holder Derivative Action*, 2020 U.S. Dist. LEXIS 262824, at *29 (S.D. Ohio Jan. 24, 2020) ("The notice ***need not be exhaustive/comprehensive***; rather, it must be reasonably

calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").[11]

In line with *Boggess* and the above authorities, the proposed Notice should be approved.

**E.** ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████[12] ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[11] Also, the Notice here suffers from none of the egregious deficiencies in *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), where the proposed notice falsely stated that class members would receive large cash payments when in fact they would receive coupons, and the only one of four original plaintiffs supporting the settlement was the son-in-law of lead class counsel.

[12] ██ ████████████████████████████████████████████████████████████████████████████████████████████████████ ███████ ████████████████████████████████████████████████ ████████████████████████████



### III. CONCLUSION

For the reasons detailed herein, Settling Shareholders respectfully submit that the Preliminary Approval Motion should be granted in full.

---

[13] ██████████████████████████████████████████

| | |
|---|---|
| Dated: December 21, 2023 | **HEFFNER HURST** |

By: */s/ Matthew T. Heffner*
Matthew T. Heffner
*mheffner@heffnerhurst.com*
30 North LaSalle, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466
Facsimile: (312) 346-2829

*Local Counsel for Plaintiffs*

**KAHN SWICK & FOTI, LLC**
Melinda A. Nicholson (admitted *pro hac vice*)
*melinda.nicholson@ksfcounsel.com*
Nicolas Kravitz
*nicolas.kravitz@ksfcounsel.com*
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Counsel for Plaintiff William Grunze*

**THE WEISER LAW FIRM, P.C.**
James Ficaro (admitted *pro hac vice*)
*jficaro@weiserlawfirm.com*
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-0206

*Counsel for Plaintiff Michael Dybas*

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn (admitted *pro hac vice*)
*rusty@shumanlawfirm.com*
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Fax: (303) 536-7849

-and-

Brett D. Stecker (*pro hac vice* application to be filed)
*brett@shumanlawfirm.com*
326 W. Lancaster Avenue
Ardmore, PA 19003

Telephone: (303) 861-3003
Fax: (303) 536-7849

**POMERANTZ LLP**

Gustavo F. Bruckner (*pro hac vice* application to be filed)
*gfbruckner@pomlaw.com*
Samuel J. Adams (*pro hac vice* application to be filed)
*sjadams@pomlaw.com*
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044

*Counsel for Plaintiff Benjamin Jason Wax*

**POMERANTZ LLP**

Patrick V. Dahlstrom
*pdahlstrom@pomlaw.com*
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Fax: (312) 229-8811

*Additional Counsel for Plaintiff Benjamin Jason Wax*