**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| IN RE EXELON CORPORATION DERIVATIVE LITIGATION | Case No. 1:21-cv-03611<br><br>Judge John Robert Blakey |

## ORDER

This matter comes before the Court on the Special Litigation Committee of the Board of Exelon Corporation's motion seeking Final Approval of a derivative settlement [279], and the motions seeking service and fee awards filed by Settling Shareholders Michael Dybas, William Grunze, and Benjamin Wax (who supported the settlement), [276], and by Opposing Shareholders James Clem, Coral Springs Police Officers' Pension Plan, Donna M. Nicosia, Melvin Peller, and Pinchas E. Raul (who opposed the settlement), [268]. For the reasons explained more fully in this Order, the Court finds that the settlement remains fair and reasonable and in the best interests of the company, and thus grants the motion for final approval [279]. Enter Final Approval Order. The Court also grants Settling Shareholders' motion for service awards and fees [276] and denies Opposing Shareholders' motion for service awards and fees. Consistent with the Stipulation and Settlement, the Court awards Settling Shareholders a combined award of $10 million, to cover service awards to Plaintiffs Dybas, Grunze, and Wax in the amount of $5,000 each, with the remainder going to counsel for fees and expenses. All matters in dispute now having been resolved, this case is closed. Civil case terminated.

## STATEMENT

### A. Final Approval of the Settlement

The Special Litigation Committee of the Board of Exelon Corporation ("SLC") filed its motion for final approval of the derivative settlement [279] on March 4, 2026. The Settling Shareholders filed a memorandum in support of the SLC's approval motion, *see* [290]. Several Opposing Shareholders filed objections, pressing the same argument they raised at the preliminary approval stage, urging the Court to reject the settlement because it "provides no tangible monetary benefit to Exelon." *See* [293], [294], [295].

Settlements of derivative actions are "particularly favored because the cases are notoriously difficult and unpredictable." *Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983); *In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("strong judicial policy" favors settlements of complex actions). Courts, therefore, do not lightly reject such settlements. *Maher*, 714 F.2d at 455. Nor do they rubber stamp them, however; before approving the settlement of a shareholders' derivative action, the Court "must determine that there has been no fraud or collusion in arriving at the settlement agreement, and that it is fair, reasonable, and adequate." *Id*.

Federal Rule of Civil Procedure 23.1 provides that a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." And the Seventh Circuit has instructed that district courts assessing proposed settlements must "weigh the probabilities and possibilities of victory or defeat as indicated by the legal or factual situation presented and determine whether the compromise, taken as a whole, is in the best interest of the corporation and all its shareholders." *Dorvit on behalf of Power Sols. Int'l, Inc. v. Winemaster*, 950 F.3d 984, 988 (7th Cir. 2020) (citing *United Founders Life Ins. Co. v. Consumers Nat. Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971)). Here, this is the case.

The settlement here includes a $40 million monetary component (already earmarked, as the Settlement Agreement explains, to be split 75/25 between Class Members in the Securities Litigation and counsel in this case), plus a litany of robust corporate therapeutics valued in the hundreds of millions of dollars and an additional $4+ million in clawed back compensation. As this Court observed at the preliminary approval phase, "the Derivative Settlement secured immediate funding for the Company to partially satisfy the Securities Litigation, as well as extensive corporate reforms to allow the Company to quickly turn the page, move past a significant corporate scandal and into a new era, where the mistakes and misconduct of the past cannot be replicated. The record suggests that the SLC investigated this matter with reasonable care, and that it proceeded efficiently and deliberately in reaching its conclusions and recommendation." [218] at 6.

Opposing Shareholders have repeatedly claimed that the monetary component of the settlement was illusory and inadequate. Although the Seventh Circuit has "elucidated several factors to guide a district court's analysis of whether a proposed settlement is fair, reasonable, and adequate," it has also "stated that the most important factor relevant to the fairness of a class action settlement is ... the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Dorvit*, 950 F.3d at 989 (citing *Kaufman v. Am. Express Travel Related Servs. Co., Inc.,* 877 F.3d 276, 284 (7th Cir. 2017)). In *Dorvit*, the district court approved a settlement with a much smaller monetary component (approximately $937,000) in part because extracting "any money in a derivative case" is unusual; the monetary component at issue here (with more than $30 million going to the company)

remains significantly more compelling. The Court previously rejected Opposing Shareholders' argument that the monetary component remains illusory, observing among other things, "that Exelon earmarked the money does not make the benefit illusory; the Company must find the money somewhere to fund the settlement and the monetary component of the Derivative Settlement obviated the need to find the significant funds elsewhere." [218] at 6–7. Opposing Shareholders have offered no factual or legal basis to revisit this initial finding (incorporated herein by reference) at this final stage, and the Court again rejects their unfounded argument.

Opposing Shareholders also claim the shareholders should have held out for a larger monetary component based upon Side-A insurance. But the record shows that the availability of such insurance was by no means certain, and the record provides no basis to second guess the sound decision to accept the $30 million in insurance and not hold out for more.

In short, the Settlement includes corporate reforms, a $44+ million monetary component, and a resolution of this dark chapter in Exelon's history; it confers, in other words, substantial benefit.

Moreover, the litigation risks were also significant. Here, even though the Government secured various guilty verdicts in the criminal matters, other criminal cases remain pending, and many of the targets of the derivative action were not charged at all in the criminal proceedings. As such, the company faced the prospect of having to pursue significant civil litigation against those individuals at the same time it defended them in the derivative litigation. As designed, the Settlement sought to alleviate the burden of costly litigation, the outcome of which was far from certain (even if the company prevailed, the robust reforms, and $40+ million monetary award, were not guaranteed). Considering that uncertainty, as well as potential issues relating to standing as to some of the Opposing Shareholders, and the general complexity and unpredictability of derivative litigation, the record amply demonstrates that the parties' Settlement, "taken as a whole, is in the best interest of the corporation and all its shareholders." *Dorvit*, 950 F.3d at 988; *Maher*, 714 F.2d at 455. *See also In re Peloton Interactive, Inc., Derivative Litig.*, No. 21-cv-2862, 2025 WL 2300266, at *5 (E.D.N.Y. Apr. 7, 2025) ("Shareholder derivative litigation is notoriously difficult and unpredictable"; "in particular the doctrine of demand futility, the business judgment rule, and the generally uncertain prospect of establishing a breach of fiduciary duties combine to make shareholder derivative suits an infamously uphill battle for plaintiffs.") (citations omitted).

The Court's assessment of the Settlement remains buttressed by the absence of any objections from shareholders other than these Opposing Shareholders. In the wake of the Court's preliminary approval order, Exelon provided Notice of the Settlement pursuant to the Court's order, and no shareholders other than the Opposing Shareholders filed objections by the March 4, 2026 deadline. The absence

of objections carries particular significance because, as the SLC notes, Exelon's "stock ownership is concentrated among sophisticated institutional investors with both the means and the motivation to object forcefully to any settlement that appeared unfair." [280] at 17. *See also* [299] at 1 n.2 ("Exelon common stock is widely held, with approximately 1.02 billion shares outstanding. The Company's shareholders include large, sophisticated institutional investors, which together own over 93% of Exelon's outstanding shares.").

For all of these reasons, the Court grants final approval, over Opposing Shareholders' objections.

## B. <u>Fee, Expenses, and Service Awards</u>

The Court turns next to the fee applications and service award requests submitted by Settling Shareholders and by Opposing Shareholders.

The record here shows that, in April of 2022, all Exelon shareholders who had submitted Demand Letters (including the Settling Shareholders and some of the Opposing Shareholders), the SLC, and Exelon and certain of the Individual Defendants, engaged retired District Judge Layn R. Phillips for mediation purposes and participated in several mediation sessions over the course of the next year (including an all-day, in person mediation on February 17, 2023); throughout the year, the parties exchanged demands, including various corporate reform proposals. *See* [220-1] (Stipulation and Agreement of Settlement) at 9. Ultimately, all of these constituents other than Opposing Shareholders agreed to resolve this matter upon terms including "the implementation of robust corporate governance reforms and a reduction in the compensation payable to former Exelon CEO Crane, as well as a monetary payment of $40,000,000.00 to the Company." *Id.* at 10.

Thereafter, the Settling Shareholders, Exelon and certain of the Individual Defendants, the SLC, the IRC, and Defendants' insurers had another mediation session with Judge Phillips to discuss an appropriate award of attorneys' fees to be paid to Settling Shareholders' counsel, "in light of the substantial and material benefits secured for Exelon and its shareholders through the Settlement." *Id.* At the end of that session, the parties agreed that the Settling Shareholders and their counsel should receive $10 million to cover fees, expenses, and individual service awards. *Id.*

Significantly, even the Opposing Shareholders, who have fought this settlement tooth and nail throughout these proceedings, do not dispute the reasonableness of the $10 million award to cover fees, expenses, and service awards. Thus, all constituents agree that the amount of the award remains fair and reasonable, and this Court also agrees upon its independent review. The Settlement's $44.25 million total monetary component and the extensive suite of corporate

reforms, valued in the hundreds of millions, would each, standing alone, justify the $10 million award; considering both in combination bolsters that finding. The settling parties also agree that approval of the Settlement was never contingent upon the approval of fees, and that the issue of fees remained separate and apart from any consideration of the propriety of the settlement. *See* [304] at 7–8 (counsel for the SLC represented that "the motion for final approval is not contingent on those pending motions for attorneys' fees."). That arrangement lends even greater credibility to the overall settlement.

The question remains: to whom should the funds be paid? Both groups of shareholders claim entitlement to the funds, both for their attorneys' fees and expenses and for service awards. Opposing Shareholders argue the two groups should be treated the same, with each shareholder (Settling or Opposing) receiving a $5,000 service award, and each set of attorneys receiving half of the remaining funds. Settling Shareholders oppose any allocation of fees or service awards to Opposing Shareholders and their attorneys.

### 1. <u>Settling Shareholders' Entitlement to Fees and Expenses</u>

First, the record supports an award of fees and expenses to counsel for Settling Shareholders.

At the preliminary approval stage, counsel for Settling Shareholders represented that "all three settling shareholders and their counsel, were involved from the outset and played a substantial role in proposing and negotiating the governance reforms and in the groundbreaking monetary component that was achieved here." [262] at 6. Counsel detailed that Dybas's litigation demand (the first the board received) set the litigation demands; and Grunze and Waz obtained internal books and records from the company under the Pennsylvania statute, and those records further informed the litigation demands. *Id.* at 6–7. Grunze retained an insurance expert to evaluate the availability of Side A insurance and to resolve other insurance issues, and Dybas and Grunze led the charge on demanding and negotiating the corporate governance reforms.

In their final approval submissions, and at the final approval hearing, counsel for the Settling Shareholders further detailed what they did to earn this substantial fee award: they were the only ones to submit actual governance proposals (in fact, counsel for the Settling Shareholders "submitted 29 total pages of very specific governance proposals") and crafted counterproposals in the months leading up to the mediation sessions, [304] at 10–11. Although Opposing Shareholders ultimately signed on to a global shareholder settlement demand, the substance of the demand came from Settling Shareholders. *Id.* at 11. Counsel for Settling Shareholders Grunze and Dybas were the only attorneys who submitted "substantial specific governance proposals"; they also followed up at least six times about the governance

proposals, including responding to the SLC's counterproposal in 2022, and in preparation for the mediation. *Id.* at 56. Settling Shareholders' counsel also negotiated the monetary components of the Settlement, including both the insurance piece and the compensation clawback, without any input from Opposing Shareholders' counsel, who rejected the package. *Id.* at 12. After the parties adopted the mediator's proposal, Settling Shareholders' counsel negotiated "a final substantive reform of adopting the clawback policy as a standalone policy," *id.* at 57; counsel also negotiated the amount of the fund for fee and service awards.

The SLC agrees that Settling Shareholders' contributed extensively: Dybas "sent the very first investigation demand to the Company on March 20, 2020, which, along with other demands, helped define the scope of the SLC's investigation and the breadth of the corporate reforms. The Settling Shareholders also proposed corporate governance reforms prior to mediation and played an important role in negotiating the reforms contained in the Settlement as well as pressing for the inclusion of the monetary component." [220] at 7. And the SLC represents that it considered a range of fees in comparable derivative settlements, including those with a corporate governance reform component and a monetary component, and determined a cap on fees of 25% of the monetary component alone remained reasonable (excluding the $4.2 million compensation clawback from former Exelon CEO Crane). At the final approval hearing, counsel for the SLC represented that, although counsel for all of the shareholders made various contributions throughout the initial proceedings, "the settling shareholders did have a lot of corporate reforms that they articulated and pursued during the course of the negotiations." [304] at 9.

Opposing Shareholders concede that Settling Shareholders' counsel performed all of the work counsel said they did to achieve this Settlement, and Opposing Shareholders do not dispute Settling Shareholders' counsel's entitlement to fees. They agree that the corporate reforms conferred a substantial benefit to the company and its shareholders, and they concede that Settling Shareholders' played a substantial, instrumental role in negotiating those reforms.

In short, counsel for the Settling Shareholders remain entitled to fees earmarked in the Settlement for fees and expenses.

### 2. Opposing Shareholders' Entitlement to Fees and Expenses

While conceding that Settling Shareholders, in fact, performed all of the work counsel claims to have performed, Opposing Shareholders argue that they contributed just as much, at least during the period of time when all shareholders were working together to push for a fair settlement. *See* [304] at 34, 40–41. And, to be sure, the record demonstrates that counsel for Opposing Shareholders played an important role in negotiating the Settlement embraced by the SLC and Settling

Shareholders, even if Opposing Shareholders ultimately rejected the Settlement before the mediator.

According to Opposing Shareholders, eight law firms participated in the mediation with the SLC, four representing the Settling Shareholders [Kahn Swick & Foti, LLC, The Weiser Law Firm, P.C., Shuman, Glenn & Stecker, and Pomerantz LLP], and four representing the Non-Settling Shareholders [Robbins LLP, Scott+Scott Attorneys at Law LLP, Bragar Eagel & Squire, P.C., and Lifshitz Law PLLC]. These shareholders say the eight firms worked together; had regular e-mail and video conferences to discuss Plaintiffs' position on settlement, and sent joint letters in furtherance of the settlement negotiations; certain firms took more of the lead on governance, others were selected to lead the communications with the mediator and the SLC, IRC and individual defendants, and all of the firms provided support for one another throughout so that the group spoke with one voice, without duplicating work. Although that process fractured at the end, all eight firms materially contributed to the process that resulted in the Settlement currently being considered by the Court. Based upon this, Opposing Shareholders ask that the Court allocate to them a portion of whatever fee it awards.

Retired Judge Phillips, who mediated both the Settlement and the subsequent attorneys' fees deal, confirmed that, up to the point where the shareholders split from a cohesive group to Settling Shareholders and Opposing Shareholders, he "understood counsel for plaintiff James Clem and counsel for all other shareholders who had not yet filed a complaint to be working collaboratively and interacting with my team, attempting to negotiate a settlement on behalf of Exelon that involved both corporate governance and monetary components." [305-1] at ¶ 5. Likewise, the SLC agrees that Opposing Shareholders contributed meaningfully to the Settlement and that all shareholders "pursued the settlement with remarkable vigor, and they had various contributions throughout it." [304] at 9.

Having said this, the record further confirms that, whatever benefit Opposing Shareholders helped confer by negotiating corporate reforms, they have also undermined such benefits by delaying the implementation of those reforms and zealously opposing this settlement.

At the final approval hearing, counsel for Exelon reported that, although the company was able to implement a handful of the exceedingly long list of corporate governance changes while this fight played out, the vast majority have been delayed by Opposing Shareholders' persistent objection to the settlement—including significant changes in policies relating to interactions with public officials and vendors, political contributions, misconduct investigations, etc. [304] at 46–49. Counsel also unequivocally represented that the delay in implementing these important reforms has created problems and unquestionably harmed the company. *Id.* at 49. And the harm extends beyond the delay: having to spend significant funds

in these proceedings to defend the settlement all constituents negotiated—with the help of a retired Judge—has also harmed the company. *Id.* Counsel's time records bear this out.[1] In fact, Opposing Shareholders' counsel admitted that, whatever time they billed negotiating the settlement, they have billed more time trying to tear it apart. [304] at 42.

Finally, counsel for Exelon represented that, although the settlement includes $30 million secured from insurers, the company's agreement with the insurer requires the company to repay the $30 million if this settlement is not approved. [304] at 51. The risk of potentially having to repay that money, which stems from Opposing Shareholders' objections, has also harmed the company. *Id.* Counsel for the SLC agreed that, although Opposing Shareholders contributed to the benefit to the company on the front end by helping to vigorously negotiate a settlement, since rejecting the mediator's proposal, Opposing Shareholders "have spent a lot of time, energy, and the company's money opposing the settlement," which is not "in the company's best interests." [304] at 9. Weighing both the benefit conferred and the harm caused post-settlement, counsel for the SLC represented that, in her view, Opposing Shareholders did not confer a substantial benefit. *Id.* at 10. Considering the record in its entirety, this assessment is confirmed.

Nevertheless, Opposing Shareholders have argued that this Court should allocate fees based upon the "overarching factor" relevant when allocating common fund fees in the class action context: "the extent to which each group of lawyers contributed to the ultimate success of the case." [287] at 8 (quoting *In re Trans Union Corp. Priv. Litig.*, No. 00 C 4729, 2009 WL 4799954, at *23 (N.D. Ill. Dec. 9, 2009), order modified and remanded, 629 F.3d 741 (7th Cir. 2011). The notion that these attorneys "contributed to the ultimate success of the case" merely by helping to negotiate corporate governance reforms in the initial stages of the case, however, fails to account for the harms they inflicted thereafter. The "ultimate success" of *this* case turns not (as Opposing Shareholders suggest) on the negotiation of a settlement, but rather upon the ability to secure preliminary, and then final, approval of a settlement. Considering this overarching factor, Opposing Shareholders' conduct, on balance, hindered, delayed, and jeopardized the ultimate success of this case. Indeed, Counsel for Opposing Shareholders acknowledged at the final approval hearing that objecting to a settlement but then seeking fees for contributing to the success of the case is "unusual, definitely." [304] at 17.

This Court confronted a similar situation in *T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-CV-7915, 2022 WL 888943, at *15 (N.D. Ill. Mar. 25, 2022), another class action case. There, Mark S., an individual who had objected to the settlement, nonetheless requested fees. The Court rejected his request. In so doing, the Court

[1] In support of their fee motion, Opposing Shareholders represent that their counsel "devoted 5,362.50 hours to the litigation, with a lodestar value of $5,637,333, including a collective lodestar of nearly $2 million up until the rejection of the mediator's Proposal." [270] at 18.

first held that, "when objectors do seek fees, 'principles of restitution' require that they 'produce an improvement in the settlement worth more than the fee they are seeking.'" 2022 WL 888943, at *26 (quoting *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 226 (N.D. Ill. 2019)). After observing that the objector "*might* have obtained a benefit for this class by raising serious questions about the timing of notice, … only a *substantial* benefit will justify attorneys' fees." 2022 WL 888943, at *28 (emphasis in original). And Mark S. did not confer a substantial benefit for the class. So too here. Although Opposing Shareholders may initially have conferred some benefit in the sense that they contributed to the advancement of the case through the mediation and helped hold the SLC to its burden, any such benefit has been overshadowed by the harm they have caused since they walked away from the mediation. To the extent they contributed to the settlement before the mediator made his recommendation, they have done nothing since, except object to the settlement, cause delay, and cost the company significant money, both in terms of the outlay pursuing this matter and in terms of lost time in implementing the negotiated corporate therapeutics (not to mention facing the risk of having to repay the $30 million in insurance). Thus, considering the entire record, any benefit conferred cannot be said to be "substantial" in this case. And because Opposing Shareholders did not confer a substantial benefit, they are not entitled to recover fees and expenses, and the Court denies their motion, [268].

### 3. **Shareholder Service Awards**

The Settling Shareholders and Opposing Shareholders seek service awards in the amount of $5,000 per shareholder. A named plaintiff is "an essential ingredient of any class action," and a service award may be "appropriate if it is necessary to induce an individual to participate in the suit." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.,* 897 F.3d 825, 834 (7th Cir. 2018) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). To determine if "an incentive award is warranted, a district court evaluates 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Id.* (quoting *Cook*, 142 F.3d at 1016).

The record shows that Settling Shareholders Dybas, Grunze, and Wax all merit service awards, and the Court finds that $5,000 remains reasonable and appropriate, given their involvement. All three Settling Shareholders made litigation demands (Dybas sent the first litigation demand), and Grunze and Wax made "books and records" demands in advance of sending their litigation demands, which informed the settlement negotiations; these Plaintiffs regularly oversaw and reviewed all of the materials counsel submitted, including the initial and supplemental litigation and settlement demands; Dybas and Grunze submitted "fulsome governance proposals in advance of the first mediation," and Wax personally attended the final approval

hearing. [304] at 61–62, 72. Counsel for the Settling Shareholders represents that these individuals submitted 29 pages of corporate governance proposals, most of which made their way into the final settlement, and the corporate governance reforms thus rest solely with these Plaintiffs.

Opposing Shareholders do not oppose service awards to Settling Shareholders, but seek awards for themselves as well. As stated above, however, the record undermines their request. In arguing that they are entitled to service awards, Opposing Shareholders emphasize that Clem filed the first action after sending a demand; Coral Springs submitted books and records and litigation demands; and the other Opposing Shareholders "all submitted litigation demands and were very active in overseeing the negotiations over the settlement." [304] at 63. Opposing Shareholders Peller and Raul also made demands and stayed informed of settlement negotiations and proceedings. *Id.* at 67–68. Counsel for Settling Shareholders notes that these Plaintiffs' demands followed Settling Shareholders' demands, and thus, added little to the negotiations. And, Opposing Plaintiff Coral Springs did not send a demand until the mediation was over. Regardless of how involved they may have been in the 2022/2023 mediation sessions, the Opposing Shareholders' conduct since then hindered and jeopardized the resolution of this matter, delayed the implementation of impactful reforms, and prevented the company from closing the book on an ugly chapter. As a result, awarding them $5,000 each for those efforts remains antithetical to the purpose of service awards.

On this issue, *Bytedance* is again instructive. In that case, the Court denied the objector's request for a service award because he failed to show that he had taken action to protect the interest of the class and failed to detail the amount of time and effort he expended in pursuing the litigation. 2022 WL 888943, at *28. Here, the Opposing Shareholders offer very little detail on what they personally added on the front end to what the Settling Shareholders submitted in terms of demands and reforms; additionally, the "time and effort" they have expended in these proceedings has not advanced but rather obstructed the settlement and prevented the implementation of the very corporate reforms they claim to have championed. Although the unified front the shareholders initially presented no doubt helped to bring the company and the SLC to the negotiating table, any marginal benefit the Opposing Shareholders added has been outstripped by the harm they have caused to the company and its shareholders by thwarting the approval and efficient effectuation of the Settlement.

Date: September 22, 2026

ENTERED:

John Robert Blakey
United States District Judge